**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0991n.06
Filed: December 20, 2005

**No. 04-5072**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Plaintiff-Appellee, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| v. | ) | |
| | ) | **O P I N I O N** |
| **WOODROW WILSON GEORGE**, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

**BEFORE:** **MOORE, ROGERS, and McKEAGUE, Circuit Judges.**

**McKEAGUE, Circuit Judge.** A Kentucky jury convicted defendant Woodrow Wilson George of carjacking with a firearm, in violation of 18 U.S.C. § 2119 and § 924(c). The district court sentenced George to 194 months imprisonment. George appeals his conviction and sentence, arguing that: (a) the identification testimony was unreliable; (b) the Government submitted insufficient evidence to meet its standard of proof; (c) the court should have granted a mistrial based on improperly admitted mug-shot evidence; (d) his trial attorney provided ineffective assistance of counsel; and (e) he was sentenced contrary to the Supreme Court's recent ruling in *United States v. Booker*.

As explained below, we affirm George's conviction, but vacate his sentence and remand to the district court for resentencing.

## I. <u>BACKGROUND</u>

### A. <u>Carjacking and Robbery</u>

Early in the morning of October 21, 2003, George, along with his cohorts Maurice "Bert" Sternberg and Dewayne Bethel, participated in a scheme to rob Joshua McFarland.[1] Sternberg masterminded the plan. He knew that McFarland sold marijuana, because the two had engaged in prior drug deals together. He reasoned that robbing a drug dealer was a good idea because the dealer would not want to get the police involved. To implement his plan, Sternberg set up a meeting with McFarland for the ostensible purpose of buying marijuana. While Sternberg distracted McFarland, the other two were to surprise and rob him.

Midway through the robbery, Sternberg's plan began to unravel. McFarland told Bethel and George that he did not have any money on him. Bethel and George forced their way into McFarland's car, with Bethel in the back, McFarland now in the passenger's seat and George in the driver's seat. McFarland refused to tell them where he lived, so George drove to where he and Bethel thought McFarland lived. They repeatedly beat McFarland during the drive. Sternberg followed from a distance in his own car.

Unknown to George or Bethel, the house to which they went was McFarland's *prior* residence. When they arrived, the two robbers discovered that McFarland had been carrying several

---

[1]The racial identity of the assailants was an issue at trial. Both Sternberg and George are Caucasian. Bethel is African-American.

hundred dollars. Upset that he had lied to them, George and Bethel forced McFarland out of the car and on the ground, pistol whipping and yelling at him the entire time.

Alerted by the commotion, two of the current residents of the house – Tahra and Alan Beam – came out. George and Bethel demanded they give McFarland's money to them. Tahra Beam tried to explain that she had no idea who McFarland was, and did not have any of his money. After several minutes of escalating confusion, culminating in George forcing both Beams to lie face down on their porch, Tahra Beam went back into the house to get the Beams' housemate, a tech sergeant in the military who had a gun. George and Bethel fled before the housemate came out.

Sternberg did not go to the residence, but rather drove around the neighborhood. He met up with Bethel (but not George) shortly after the incident. The two ditched Sternberg's car and split up the stolen cash and jewelry.

## B. Investigation and Trial

After the melee, Sternberg's plan took another unexpected turn – the police were called to investigate. The detective in charge, Chris Flowers, noted that the Beams seemed to be in shock when he arrived. Alan Beam could not identify either of the assailants. Tahra Beam was "terrified" and could only describe the two robbers as "a white guy and a black guy." She said the "white guy" was closest to her on the porch, and had pointed his gun at her and her husband.

The detective also interviewed McFarland. McFarland was reluctant to tell the detective he was a drug dealer, so he initially told him that he was vacuuming his car at the time of the carjacking; he later admitted to police that he was a drug dealer. He knew Sternberg (who was

arrested shortly after the incident), and recognized George from school, but could not "put a name to his face right then." He gave Detective Flowers two names he thought might be that of the Caucasian assailant, but told the detective he was not sure about either name. Detective Flowers encouraged McFarland to talk with some other people and even look at a yearbook if necessary. McFarland did not know or recognize Bethel.

Within a couple of days, McFarland spoke to another schoolmate who suggested that his description matched that of Will George. McFarland testified that when he heard the name, he recognized it immediately. Based on this information, Detective Flowers compiled a photographic array, using a prior mug shot of George and photographs of five other individuals with similar appearances. In selecting the other photographs, Detective Flowers testified that officers searched thousands of pictures.

McFarland and Tahra Beam each looked at the photographic array. Detective Flowers instructed them to make a positive identification only if "absolutely certain." He informed them that they would have to testify in court about any identification made or not made. He instructed them to place a finger on the person they recognized and tell him how they knew that person – e.g., was he the person who committed the crime, was he someone the witness knew socially, etc. Both victims identified George as the assailant.[2]

George was arrested based on the eye witness identification. Although none of the victims could identify Bethel, he was subsequently arrested after trying to fence some of the stolen jewelry.

---

[2]Both were able to identify George even though his hairstyle was different in the array (shaved) than it was at the time of the crime (longer, braided hair).

Sternberg and Bethel pleaded guilty to state charges for their involvement in the crime; neither were charged in federal court. The Government charged George with carjacking with a firearm, in violation of 18 U.S.C. § 2119 and § 924(c).

Prior to trial, George's counsel moved to suppress the photographic array identification. Counsel argued that it was impermissibly suggestive. The district court denied the motion.

Sternberg and Bethel testified for the Government. Both identified George as the third participant in the crime. Both also admitted, however, to lying to police on several occasions. For example, Sternberg initially refused to give the police George's and Bethel's real names, instead giving police "false names" in an attempt to "protect them." After he was arrested, Bethel gave to the police a statement consistent with his testimony at trial – Sternberg devised the plan, Bethel and George carried it out. After talking with Sternberg in jail, however, Bethel tried to retract the statement. Sternberg and Bethel then made various attempts to reduce their respective roles in the crime, including suggesting that George went beyond the scope of the original plan (Sternberg's version) and that George forced Bethel to participate (Bethel's version). Sternberg even recruited a cousin to confirm their new stories with the police, and tried to get the help of an ex-girlfriend, but she refused.

Two of the victims, McFarland and Tahra Beam, also testified for the Government. Both witnesses identified George as the Caucasian assailant.

## C.     **Motion for Mistrial**

Detective Flowers testified about his investigation as well as the photographic array used to identify George. Near the end of his direct examination, the following colloquy occurred:

Q.      . . . When you were showing us who they picked, I guess we really probably couldn't see exactly who that was. Just to make the record perfectly clear, if you would just indicate to the jury which photograph both Mr. McFarland and Miss Beam picked.

A.      Ladies and gentlemen, both Mr. McFarland and Miss Beam identified Photo No. 2, which is Jefferson County Identification Jail Number 448 –

Defense counsel objected and later moved for a mistrial, arguing that any evidence of George's prior incarceration or arrest was inadmissible and prejudicial to George's right to a fair trial. The district court denied the motion, opting instead to give the following instruction directly after Detective Flowers's testimony:

One other thing I want to mention to the jury. During the discussion about the photo pack identification, I don't want the jury to be misled. No one should conclude from anything the officer said that Mr. George has previously been in jail. You should not conclude that or you should not conclude that he's previously been arrested for a felony or other crime, okay? There may have been some confusion there.

## D.      Conviction and Sentence

The jury convicted George of both counts. The district court sentenced him to 110 months imprisonment for the carjacking and 84 months imprisonment for the firearm, to run consecutively. The district court issued the sentence under the then-mandatory federal sentencing guidelines. George objected to several sentencing matters, but did not challenge the constitutionality or mandatory nature of the guidelines.

George now appeals both his conviction and sentence.

## II. **DISCUSSION**

A.      **Reliability of Witness Identification**

The main issue at trial centered around the identity of the Caucasian assailant.  Accordingly, eye witness testimony was critical.  George claims on appeal that the photographic array was so unreliable as to violate his Fifth Amendment right to due process.[3]  He takes issue with the inclusion of his mug shot in the array as well as how Detective Flowers administered the array.

In analyzing the district court's ruling on George's pretrial motion to suppress, we review its factual findings for clear error and its legal conclusions *de novo*. *United States v. Meyer*, 359 F.3d 820, 824 (6th Cir.), *cert. denied*, 125 S. Ct. 112 (2004) (citing *United States v. Dotson*, 49 F.3d 227, 229 (6th Cir. 1995)).  "Whether identification evidence was 'sufficiently reliable so as not to offend appellant's rights under the due process clause' is a question of law." *Id.* (quoting *Smith v. Perini*, 723 F.2d 478, 481 (6th Cir. 1983)).

To maintain his due process claim, George must show that the identification procedure was so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).  We rely on a two-step analysis to determine whether such likelihood of misidentification existed.  George bears the initial burden of proving that the identification procedure was impermissibly suggestive.  If he meets this burden, we then evaluate "the totality of the circumstances to determine whether the identification was nevertheless reliable."

---

[3]"No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V.

*Meyer*, 359 F.3d at 824 (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1071-72 (6th Cir. 1994)). If the identification procedure was not impermissibly suggestive or the identification was nevertheless reliable, there is no due process violation and we leave it to "the jury to determine the ultimate weight to be given the identification." *Smith*, 723 F.2d at 482 (citation omitted); *see also Meyer*, 359 F.3d at 824.

The record shows that the Government's identification procedure accorded with due process. George does not point to any specific item in the photograph of him used in the array which would suggest it was, in fact, a mug shot. His photograph appeared similar in size and appearance to the photographs of the other five individuals in the array. There were no jail identification numbers visible. Thus, the use of George's mug shot in the array did not create an inference that he had previously been in jail.

Moreover, police searched thousands of pictures of individuals before selecting five individuals who were similar to George in appearance. The victims were instructed to make a positive identification only if absolutely certain. The police used these and other procedures to safeguard against a false-positive identification.

George asserts, however, that more should have been done. He lists a number of additional procedures that should have been used, including videotaping the identification and creating a written record to which the witness could "change, add, emphasize, or de-emphasize anything." George fails to cite, however, any authority suggesting that due process requires the use of such procedures during a photographic array. We decline to create a checklist of procedures law

enforcement must use when administering such arrays, and find that the procedures used here were sufficient.

George also argues that Tahra Beam's positive identification of him must have been the result of an unduly suggestive photographic array. In support, he cites her inability to give a detailed description of the Caucasian assailant shortly after the crime, as well as the change in George's appearance from the time of the crime to the time of the mug shot. This argument does not stand on its own as a separate legal claim for relief, but rather as another evidentiary basis for his due process claim that the use of his mug shot, and the alleged deficiencies in administering the array, were unduly suggestive. Even with this inferential evidence, George does not satisfy his initial burden of showing that the pre-trial identification was unduly suggestive. Accordingly, we need not determine whether the identification was reliable notwithstanding the identification procedures used.

**B.** **Sufficiency of the Evidence**

In addition to his claim that the photographic array was unreliable, George argues more broadly that the Government presented insufficient evidence that he – as opposed to someone else – participated in the crime. To prevail on this claim, George must carry a heavy burden. *United States v. Wright*, 16 F.3d 1429, 1439 (6th Cir. 1994). There exists sufficient evidence to support a conviction if a rational jury could find the elements of a crime beyond a reasonable doubt. *Id.* In reviewing his claim, we view the evidence in the light most favorable to the Government, giving it the benefit of all reasonably drawn inferences. *United States v. Sawyers*, 409 F.3d 732, 735 (6th Cir.), *cert. denied*, 2005 WL 2494120 (Oct. 11, 2005); *United States v. Barnett*, 398 F.3d 516, 521-

22 (6th Cir.), *cert. dismissed*, 126 S. Ct. 33 (2005). We will reverse "a judgment for insufficiency of the evidence 'only if [the] judgment is not supported by substantial and competent evidence upon the record as a whole.'" *Barnett*, 398 F.3d at 522 (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)).

We note at the outset that George does not address any of the specific elements of the two counts of which he was convicted. He argues instead that someone else committed the crime. Therefore, we confine our review to the identification evidence. While the Government presented no direct physical evidence of his involvement, it did provide conclusive direct and circumstantial testimonial evidence. Most importantly, four eye witnesses – two accomplices and two victims – testified that George participated in the crime.

A criminal conviction can be supported by accomplice testimony alone. *United States v. Tines*, 70 F.3d 891, 899 (6th Cir. 1995); *United States v. Frost*, 914 F.2d 756, 762 (6th Cir. 1990). Of course, as is common with criminal accomplices, Sternberg and Bethel were hardly model witnesses. Both admitted lying to the police as well as scheming to place most or all of the blame on George. We point out, however, that throughout the various iterations of their stories, they invariably identified George as the Caucasian assailant, with the lone deviation being Sternberg's initial attempt to give the police "false names." There is nothing in the record to link these unidentified "false names" to any specific person – i.e., the "false names" referred to fictitious persons, rather than actual persons Sternberg knew whom he may have later tried to protect by implicating George. Thus, other than this initial attempt to divert the police, the two accomplices

consistently identified George as the third participant, even though they also consistently tried to reduce their own respective roles in the crime.

In any event, the jury heard about the earlier lies and schemes during Sternberg's and Bethel's testimony. The jury had the opportunity to assess the accomplices' credibility as witnesses and determine the weight to be given (if any) to their testimony in light of these admissions. We have steadfastly held that in cases in which this court is asked to assess the sufficiency of the evidence, we will not usurp the province of the jury by reweighing the evidence, reassessing the credibility of witnesses, or substituting our judgment for that of the jury. *Barnett*, 398 F.3d at 522; *Wright*, 16 F.3d at 1440.

As previously mentioned, the Government did not rely solely on accomplice testimony. The testimony of McFarland and Tahra Beam itself provided sufficient evidence of George's involvement, and further bolstered the accomplice testimony. Both McFarland and Tahra Beam unambiguously identified George as one of the assailants. While defense counsel attacked both witnesses' identification during trial – e.g., McFarland was unable to identify George by name immediately after the crime, even though the two went to school together, and Tahra Beam could provide little descriptive information immediately after the crime – these matters again went to their credibility as witnesses and the weight of their testimony, not the sufficiency of their identification.

## C.    Witness Reference to Jail Identification Number

George next claims that the district court erred in denying his motion for mistrial based on Officer Flowers's reference during testimony to the mug shot jail identification number. Whether

to declare a mistrial is within the trial court's sound discretion. *United States v. Macias*, 387 F.3d 509, 515 (6th Cir. 2004). We review the denial of a motion for mistrial for an abuse of discretion, *id.*; *United States v. Ursery*, 109 F.3d 1129, 1133 (6th Cir. 1997), and we find none here.

Trial courts generally exclude mug shots from evidence. Mug shots, like evidence of prior convictions, are usually not admissible under Fed. R. Evid. 404(b) (evidence of other crimes, wrongs, or acts). Even if relevant, a mug shot tends to make people believe that the person is "bad," and therefore can be unfairly prejudicial. Fed. R. Evid. 403. Moreover, the visual impact of a mug shot, apart from mere references to a prior conviction, can leave a lasting, although illegitimate, impact on the jury. *United States v. McCoy*, 848 F.2d 743, 745-46 (6th Cir. 1988). Accordingly, the use of mug shots at trial is highly disfavored.

In the instant case, the parties agreed before trial that the Government could introduce a photocopy of the photographic array. The photograph of George in the array does not contain any of the typical indicia of a mug shot, at least from what can be seen from the photocopy. For example, there are no jail identification numbers visible nor any lines in the background for measuring a person's height. George does not argue, and we do not find, that the photocopy of George's picture resembled a mug shot. Therefore, only the testimonial reference by Detective Flowers is challenged here.

Without a doubt, Detective Flowers's reference to the jail identification number was inadmissible. *See* Fed. R. Evid. 404(b); *McCoy*, 848 F.2d at 745-46. The Government did not, however, directly ask Detective Flowers about the identification number or otherwise elicit information about it – i.e., there was "no deliberate effort to inflame the jury." *Ursery*, 109 F.3d at

1133. Rather, Detective Flowers gave a more complete answer to the Government's inquiry than he should have.

The district court properly handled the matter. The reference to the number was brief and innocuous. The district court gave the jury a curative instruction immediately at the end of Detective Flowers's testimony. The instruction was clear and simple: no juror should conclude from anything the detective said that George had previously been in jail. As we explained in *United States v. Blakeney*, "properly prepared curative instructions are often sufficient to cure any prejudice resulting from the jury hearing inadmissible evidence." 942 F.2d 1001, 1030 (6th Cir. 1991) (citing *United States v. Bowers*, 739 F.2d 1050, 1054-55 (6th Cir. 1984)); *see also Ursery*, 109 F.3d at 1133. The court's instruction cured any prejudice to George from Detective Flowers's inadmissible statement, and therefore the court correctly denied the request for mistrial.[4]

---

[4]George relies on *Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir. 1979), in support of his position that the district court erred in denying him a mistrial. The case is distinguishable, however, on a number of points. A photograph of the defendant in that case – "clearly" identifiable as a mug shot – was introduced into evidence. *Id.* at 277. The Sixth Circuit explicitly declined to find that the introduction of the mug shot alone reached the level of "constitutional magnitude." *Id.* at 280. Finally, and most importantly, there was no cautionary instruction given to the jury, unlike in the present case. *Id.* at 277.

The remaining decisions cited by George either support the Government's position or are likewise distinguishable. *See, e.g.*, *Murray v. Superintendent, Ky. State Penitentiary*, 651 F.2d 451 (6th Cir. 1981) (on *habeas* review, finding no due process violation with the introduction into evidence of the defendant's prior felony convictions and mug shot because the trial court gave a limiting instruction); *United States v. Reed*, 376 F.2d 226 (7th Cir. 1967) (finding that multiple references to the defendant's criminal history and mug shots from prison prejudiced his right to be presumed innocent; no specific limiting instruction was given).

**D.      Sentence in Light of *United States v. Booker***

George contends that the district court sentenced him in violation of the Supreme Court's

decision in *United States v. Booker*, 125 S. Ct. 738 (2005). The Government concedes that George's

sentence imposed under the then-mandatory sentencing guidelines constituted plain error and that

remand to the district court for resentencing is appropriate. *United States v. McCraven*, 401 F.3d

693, 700 (6th Cir. 2005); *Barnett*, 398 F.3d at 527, 530-31. We agree, and will vacate George's

sentence and remand the case for resentencing.[5]

**E.      Ineffective Assistance of Trial Counsel**

Finally, as to George's claim that he received ineffective assistance of trial counsel in

violation of the Sixth Amendment,[6] we generally do not consider such claims on direct appeal, as

the record of counsel's performance is not fully developed. *United States v. Sanders*, 404 F.3d 980,

986 (6th Cir. 2005); *United States v. Crowe*, 291 F.3d 884, 886 (6th Cir. 2002); *United States v.*

*Pierce,* 62 F.3d 818, 833 (6th Cir.1995); *see also Massaro v. United States*, 538 U.S. 500, 504

(2003) ("In light of the way our system has developed, in most cases a motion brought under [28

---

[5]George argues that the district court violated his Sixth Amendment right to a jury trial by enhancing his sentence based on facts not found by the jury beyond a reasonable doubt. Under this circuit's case law, we review a defendant's Sixth Amendment claim separately from a claim that the defendant was sentenced under a mandatory, rather than advisory, guideline scheme. *See, e.g.*, *United States v. Frydman*, 2005 FED App. 0827N (6th Cir.) (finding no Sixth Amendment violation, but remanding under *Booker* because the defendant was sentenced under a mandatory sentencing guideline scheme). We find no cause to address George's Sixth Amendment claim, however, given that we vacate his sentence on other grounds and remand to the district court for resentencing.

[6]"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

U.S.C.] § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance.").

Although in rare cases we may elect to reach the merits of such claims, *Pierce*, 62 F.3d at 833, we

decline to do so here.  George should instead have the opportunity to present any ineffective

assistance of counsel claims with the benefit of a complete trial, sentencing and appellate record.

## III.  <u>CONCLUSION</u>

Accordingly, we affirm George's conviction, vacate his sentence and remand to the district

court for resentencing.