**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0869n.06

**Nos. 12-4012; 12-4014**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Oct 04, 2013 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Southern |
| KEITH WATSON (12-4012); and | ) | District of Ohio |
| THERON LEWIS (12-4014), | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

Before:    BOGGS and SILER, Circuit Judges; and DOWD, District Judge.[*]

BOGGS, Circuit Judge.  Keith Watson and Theron Lewis entered conditional guilty pleas to federal firearms charges and violation of the Hobbs Act for their respective roles in a home invasion that turned into a murder.  Both reserved the right to appeal the district court's denial of their motions to suppress identifications made by the surviving witnesses to the criminal episode. Watson and Lewis claim that the manner in which the police conducted the photo arrays that led to their respective identifications was overly prejudicial.  Their arguments lack merit.  For the reasons that follow, we affirm the district court.

---

[*]The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

I

In April 2007, three armed men    Watson, Lewis, and a now-deceased accomplice    broke into a Dayton, Ohio residence.  Six adults occupied the house at the time: Dwayne Burg, Sr. and his two adult sons, Dwayne Burg, Jr. and Torrance Burg; Brandy Hurston, daughter of Burg, Sr.; and two family friends, Cassandra Powers and Roderick Cotheron.  The first gunman (Lewis) proceeded to a back bedroom and confronted Burg, Sr. and his sons.  The second gunman (the accomplice) positioned himself outside the bedroom door.  The third gunman (Watson) remained at the front door.

This robbery was unquestionably drug related.  The three co-conspirators were known members of the Hooskal Clique street gang, and sought drugs and cash from a marijuana and crack distribution operation purportedly run by Burg, Jr.  The first gunman interrogated Burg, Sr. and his sons regarding the whereabouts of the assets of the drug operation.  The Burgs initially denied possessing either drugs or drug proceeds.  The argument grew increasingly tense.  During the heat of the exchange, the first gunman fired two shots from a .380-caliber handgun into Burg, Sr.'s midsection.  He later died of his wounds.

The third gunman remained within view of both Hurston and Powers.  Hurston was in the living room of the home, about five feet away from the front door.  She turned several times towards the door to check on her one-year-old son, who was sleeping in a bedroom adjacent to the front door.  She took "a very long, steady look" at the unmasked gunman, who then pointed his weapon at her and yelled, "Shut up, [b]itch, and quit looking at me."  Powers similarly had a prolonged and

unobstructed view of the third gunman from the kitchen, which was within direct line of sight of the doorway.

The first and second gunmen eventually emerged from the back of the house with a pillow containing $5,200. Together with their co-conspirator, the three gunmen fled the scene. Dayton police interviewed all five of the surviving victims after the crime. However, none of them were able to identify any of the perpetrators despite being shown numerous photo arrays. The case went cold for two years.

In June 2009, over two years after the crime, Burg, Jr. viewed a news report on an unrelated murder. Mugshots of Lewis and Watson, both of whom were linked to this separate crime, were included in the report. Though he had never before met Lewis, Burg, Jr. instantly recognized Lewis's mugshot as that of his father's shooter. Torrance Burg viewed the same broadcast later that evening and similarly identified Lewis as the first gunman. Hurston received a phone call from her brothers, advising her to watch the report. She viewed a recorded copy later the same day and identified the photograph of Watson as that of the third gunman.

A family member contacted the authorities, and Burg, Jr. received a phone call from Detective Michael Galbraith several days later. Burg, Jr. told the detective that he recognized the mugshot shown on television as that of his father's shooter and identified the man by his gang name, "T-Streets." Detective Galbraith contacted another Dayton homicide detective, Greg Gaier, who was working an active homicide for which Lewis had recently been arrested. Detective Gaier gave Detective Galbraith a photo array containing a picture of Lewis which, unbeknownst to either, was

the very same photo that had appeared on the news report. Detective Galbraith presented this array to the Burg brothers, both of whom made a positive identification of Lewis.

No further action pertinent to this case occurred until January 2010, at which point Detective Gaier took over the investigation of the homicide of Burg, Sr. The detective approached Hurston with a photo array containing a picture of Watson, whom he suspected of involvement in the 2007 home invasion based upon his long-standing criminal connection to Lewis. Hurston positively identified Watson as the third gunman. Detective Gaier also contacted Powers and presented her with the same array. Powers was unable to make a positive identification based on this first array, though she stated that two photos    one of Watson and one of another man    could possibly be that of the third gunman. The photograph of Watson in this array was a then-recent (2009) mugshot. Detective Gaier created a second photo array using a picture of Watson that was taken around April 2007, the time of the crime. The detective presented Powers with this second array two days later. Powers made a positive identification of Watson within five seconds.

A federal grand jury in the Southern District of Ohio indicted Watson and Lewis, charging both with violation of federal gun laws and the Hobbs Act. The defendants moved to suppress the respective identifications made by the victims. Watson challenged Hurston's identification on the grounds that it was not administered blindly (*i.e.*, by a detective not assigned to the case) or sequentially (one photo at a time, as opposed to a six-photo array) and, thus, was inherently tainted by undue suggestiveness. As to Powers's identification, he asserted that he was prejudiced by Detective Gaier's failure to include in the second array a photograph of the other man noted earlier by Powers as a potential match. In his separate motion, Lewis claimed that Detective Galbraith's

use of the same photograph that appeared on the news report prejudiced the identifications made via the photo array.

After holding two evidentiary hearings, the district court denied the defendants' motions as to the identifications of Lewis made by the Burg brothers, and the identifications of Watson made by Hurston and Powers.[1]  *United States v. Lewis*, 838 F. Supp. 2d 689, 703 (S.D. Ohio 2012).  The defendants subsequently entered conditional guilty pleas.  Both reserved the right to appeal the adverse dispositions of their respective suppression motions.  Those issues are presently before this court.

II

Due process forbids police officers from using identification procedures that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384 (1968).  As recently elucidated by the Supreme Court, the guiding rationale behind this prohibition is not to ensure the reliability of identification evidence, but to deter malfeasance by investigating officers.  *Perry v. New Hampshire*, 132 S. Ct. 716, 726 (2012).  Accordingly, identification evidence produced under potentially suggestive circumstances will not be suppressed unless there is improper behavior by state officials giving rise to the suggestiveness.  *Id.* at 721 ("When no improper law enforcement activity is involved, . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination,

---

[1]The district court suppressed an identification of Lewis made by Hurston.  The government did not appeal the suppression, and we thus do not address the correctness of that decision.

protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.").

In reviewing the denial of a motion to suppress identification evidence, we review the district court's findings of fact for clear error and its findings of law *de novo*. *United States v. Meyer*, 359 F.3d 820, 824 (6th Cir. 2004). Suppression is warranted only if (1) the identification procedure was unduly suggestive, and (2) the identification was not otherwise reliable under the totality of the circumstances. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 71(6th Cir. 1994). We look first to the defendant to prove that the identification process used was in fact unduly suggestive. *United States v. Beverly*, 369 F.3d 516, 538 (6th Cir. 2004). Mere suggestiveness does not give rise to a constitutional violation. *Howard v. Bouchard*, 405 F.3d 459, 470 (6th Cir. 2005). Rather, the evil to be avoided is unnecessary suggestiveness that creates a substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). If the defendant fails to show that the identification procedure was tainted by undue suggestiveness, our analysis ends. *See ibid.*

III

Watson challenges the identifications made by both Hurston and Powers. He presents different arguments against each identification. His complaint against the identification made by Hurston is that Detective Gaier's use of a non-blind, non-sequential line up was inherently suggestive. He cites Ohio Revised Code § 2933.83 (effective as of July 6, 2010), which mandates the use of blindly administered photo line ups. By Watson's own admission, the Ohio statute is irrelevant to our inquiry: it is neither controlling federal statute nor federal constitutional law. He also quotes extensively from an academic article criticizing the Supreme Court's decision in *Manson*

*v. Brathwaite*, 432 U.S. 98 (1977), in which the Court rejected a *per se* exclusionary rule for unduly suggestive identifications. Notwithstanding the lack of merit in this argument on its own terms, *see Perry*, 132 S. Ct. at 724 25 (reaffirming *Brathwaite*), complaints against *Brathwaite*'s remedial scheme are irrelevant to the question of whether the identification procedure at issue was unduly suggestive in the first instance. We therefore reject Watson's challenge to Hurston's identification.

Watson's criticism of Powers's identification arises from her selection of two potential matches for the third gunman in the first photo array Watson and another unnamed individual. He posits that failure to include this unnamed individual in the second array, from which Powers identified Watson, made the array suggestive of him. In a very basic sense, this procedure was indeed suggestive of Watson. Dayton officials suspected Watson of involvement in the April 2007 home invasion and thus focused their investigatory efforts on him. However, bare suggestiveness is not a constitutional problem. What the Constitution forbids is *undue* suggestiveness. *Beverly*, 369 F.3d at 538.

Watson brings forth neither law nor reason that would support a finding of undue suggestiveness. Review of the record reveals that Detective Gaier was quite careful and undoubtedly fair in administering both photo arrays. Before conducting both arrays, Detective Gaier read a set of instructions that included a warning that the arrays "may or may not contain a picture of the person who committed the crime now being investigated." No evidence in the record suggests that he attempted to influence Powers's selection. The five filler photos in both arrays shared many characteristics with the photos of Watson used in each, that is, Watson's photos did not stand out.

Furthermore, the two photos of Watson are quite distinct from each other.  In the first array, Watson's face appears full and rounded, his hair is short with no visible braids, and he has a light beard and moustache.  The filler pictures in this array shared these characteristics: all have rounded faces, short hair, and a light facial hair.  Conversely, in the photo used in the second array, Watson's face appears thin and less rounded, his hair is tied close to his head with braids hanging below his neck, and he has a thicker beard and moustache.  Again, all of the filler photos in this array look similar, namely, all have thinner faces and visible braids.

Failure to include the other individual pointed out in the first array did not taint the second photo array, which was otherwise conducted fairly, with undue suggestiveness.  Including that individual   who shares physical characteristics with Watson as he appeared in 2009, but not necessarily as he did in 2007   in the second array may well have created undue suggestiveness towards that individual.  Watson's argument falls short of showing clear error on part of the district court, and we therefore affirm the court's decision to allow identification into evidence.

IV

Lewis attacks the identifications made by the Burg brothers because the photo array presented to both men contained the same mugshot that appeared on the June 2009 newscast that precipitated the family's phone call to the police.  However, he does not contend, nor does the record support, that Dayton police arranged to have the mugshot used in the photo array to appear on TV, nor that they deliberately used a photo that they knew had just been seen widely.  To be sure, jail records, including mugshots of arrestees, are generally matters of public record, *see* Montgomery County Jail Records of Persons in Custody, http://mont.miamivalleyjails.org/ (last visited July 26, 2013), and

the media may therefore come into possession of these records under a variety of circumstances and for a variety of reasons. In short, the most that we can conclude is that bad luck, not police malfeasance, led to any suggestiveness that there may have been in the identification procedure. This is fatal to his argument. *See Perry*, 132 S. Ct. at 721.

V

For the foregoing reasons, we **AFFIRM** the district court.