*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0055P (6th Cir.)
File Name: 04a0055p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

> No. 02-3582

ROBERT A. MEYER,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-00085—Ann Aldrich, District Judge.

Argued: September 19, 2003

Decided and Filed: February 23, 2004

Before: SUHRHEINRICH, COLE, and ROGERS, Circuit
Judges.

———————

## COUNSEL

**ARGUED:** Charles E. Fleming, FEDERAL PUBLIC
DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant.
Nancy L. Kelley, ASSISTANT UNITED STATES
ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:**
Charles E. Fleming, FEDERAL PUBLIC DEFENDER'S
OFFICE, Cleveland, Ohio, for Appellant. Nancy L. Kelley,

ASSISTANT UNITED STATES ATTORNEY, Cleveland,
Ohio, for Appellee.

ROGERS, J., delivered the opinion of the court, in which
SUHRHEINRICH, J., joined.    COLE, J. (pp. 12-17),
delivered a separate dissenting opinion.

———————

## OPINION

———————

ROGERS, Circuit Judge. A jury convicted the defendant,
Robert Meyer, of postal robbery in violation of 18 U.S.C.
§ 2114 and of using a firearm during a crime of violence in
violation of 18 U.S.C. § 924(c)(1). On appeal, Meyer argues
that the district court erred in denying his motion to suppress
any in-court identification by the victim, and he challenges
the sufficiency of the evidence. We conclude (1) that the in-
court identification procedure devised by the district court
was not impermissibly suggestive, (2) that, even if the process
were impermissibly suggestive, the identification was
independently reliable, and (3) that a rational trier of fact
could have found the essential elements of the crimes beyond
a reasonable doubt. Accordingly, we affirm the judgment of
the district court.

## BACKGROUND

On February 24, 1997, Jarmel M. Shaw, a postal employee,
was robbed at gunpoint. Shaw had completed his mail
collection route and had returned to the loading dock of the
Mansfield (Ohio) Main Post Office. As he moved his last
pickup, a basket of first class mail, to the back of the truck,
the perpetrator opened the driver's side door. He pointed a
gun in Shaw's face and demanded, "Give me the cash box,
give me the cash box." Shaw told the offender that he had
already taken the cashbox inside. The offender then directed
Shaw to move to the back of the truck and entered the vehicle

and surveyed its contents. As the offender searched the truck for the keys, Shaw opened the rear door and ran across the loading dock into the post office. As he ran, Shaw heard a single gun shot, but he was unharmed.

On May 30, 1997, Terry Barrett, the postal inspector investigating the robbery, presented Shaw with a photo lineup. Specifically, Shaw was shown six photographs, five of individuals interviewed in connection with the investigation and one of a postal employee. Meyer was not yet a suspect, and his photograph was not included in the lineup. Shaw did not identify anyone as the perpetrator.

On June 19, 2000, Barrett conducted a second photo lineup. Since the May 1997 lineup, investigators had identified Meyer as a suspect, and, to create a new lineup, Barrett simply replaced the photograph of the postal employee with a photograph of Meyer taken in June 2000. The other five photographs remained the same. Shaw failed to make an identification.

Believing that he had built a strong case against Meyer, Barrett was "perplexed" when Shaw failed to identify Meyer. As Shaw prepared to leave, Barrett, "on a hunch," displayed a second photograph of Meyer, which had been taken in 1997, for Shaw. (Barrett did not show Shaw any other photographs at this time.) Barrett asked Shaw whether he recognized the man in the photograph, and Shaw immediately identified Meyer as the robber.

On August 10, 2000, Barrett conducted a third photo lineup. The first five photographs in the lineup were the five pictures used in the prior lineups. However, the sixth photograph was the 1997 picture of Meyer, which Barrett had shown individually to Shaw after the June 2000 lineup. Shaw again identified Meyer as the robber.

On February 21, 2001, the Government filed a two-count indictment against Meyer, alleging robbery of a postal

employee in violation of 18 U.S.C. § 2114 and using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1). Prior to trial, Meyer moved to suppress any pretrial or in-court identifications of Meyer by Shaw, arguing that the identification procedure used by Barrett was impermissibly suggestive and that this procedure would taint any subsequent in-court identification. The district court granted Meyer's motion to suppress all pretrial identifications, but it denied Meyer's motion to suppress any in-court identification. It stated that it would devise a procedure to minimize the effect of the tainted pretrial identifications.

On March 25, 2002, Meyer's jury trial began. Prior to Shaw's testimony, the district court staged a lineup in an effort to minimize the taint of the pretrial identifications. The jurors were removed from the courtroom, and Meyer was placed in the jury box with seven men of similar age and appearance. Shaw identified Meyer, and, during his testimony, he identified Meyer as the robber. Meyer objected to the identification during both the lineup and Shaw's testimony.

The jury convicted Meyer of both counts. On April 14, 2002, Meyer filed a motion for judgment of acquittal, arguing that the Government had not presented sufficient evidence to support a guilty verdict on either count, and a motion for a new trial, arguing that the impermissibly suggestive pretrial identifications tainted Meyer's in-court identification. On May 3, 2002, the district court denied both motions. It found that the Government had presented sufficient evidence to support the verdict, that the in-court identification procedure was not impermissibly suggestive, and that the in-court identification was independently reliable. On May 20, 2002, Meyer filed a timely notice of appeal.

## ANALYSIS

### 1. Motion to Suppress In-Court Identification

In reviewing a district court's ruling on a motion to suppress, we apply the clearly erroneous standard to the district court's factual findings and the de novo standard to its legal conclusions. *United States v. Dotson*, 49 F.3d 227, 229 (6th Cir. 1995). Whether identification evidence was "sufficiently reliable so as not to offend appellant's rights under the due process clause" is a question of law. *Smith v. Perini*, 723 F.2d 478, 481 (6th Cir. 1983).

A conviction based on identification testimony violates the defendant's constitutional right to due process whenever the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). A defendant is denied due process "only when the identification evidence is so unreliable that its introduction renders a trial unfair." *Smith*, 723 F.2d at 482 (quoting *Summit v. Bordenkircher*, 608 F.2d 247, 253 (6th Cir. 1979)). "As long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given to the identification." *Id.*; *see also United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992).

This court has prescribed a two-step analysis for determining the admissibility of identification evidence. *Ledbetter v. Edwards*, 35 F.3d 1062, 1071-72 (6th Cir. 1994); *Hill,* 967 F.2d at 230. First, the defendant bears the burden of proving that the identification procedure was impermissibly suggestive. *Id.* Second, if the defendant meets this burden, the court evaluates the totality of the circumstances to determine whether the identification was nevertheless reliable. *Id.* The following factors guide the court's reliability analysis: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of

attention at the time of the crime; (3) the accuracy of the witness's prior description of the defendant; (4) the witnesses's level of certainty when identifying the defendant at the confrontation; and (5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *Ledbetter*, 35 F.3d at 1071 (applying the *Biggers* factors); *Hill*, 967 F.2d at 230 (same). If the defendant fails to show that the procedure was impermissibly suggestive, or if the totality of the circumstances indicates that the identification was otherwise reliable, admission of the identification testimony does not violate the defendant's right to due process.

Meyer contends that the district court erred in permitting Shaw's in-court identification. He argues that the pretrial identifications in June 2000 and August 2000, which the district court deemed impermissibly suggestive, tainted Shaw's in-court identification. In fact, he charges that Postal Inspector Barrett's suggestive behavior—the display of the single photograph—was so flagrant that it rendered Shaw incapable of making an independent identification. No procedure devised by the district court, he maintains, could have eliminated the taint of Inspector Barrett's misconduct.

Meyer also contends that, under the *Biggers* analysis, Shaw's identification was not independently reliable. First, he insists that Shaw had limited opportunity to view the perpetrator, as, although the encounter lasted two to four minutes, Shaw was able to view the perpetrator's face for only "some fraction" of this time. Second, he questions Shaw's degree of attention, asserting that Shaw was distracted by his concern for his safety. Third, he brands Shaw's prior description inaccurate, noting that, in his initial statement to investigators, Shaw described the perpetrator as a man in his twenties or thirties and did not mention gray hair or facial hair. (At the time of the incident, Meyer was in his early forties and, apparently, had gray hair and a mustache.) Fourth, he discounts the high degree of certainty evinced by Shaw at confrontation, dismissing it as a product of the earlier

suggestive procedures. Fifth, he claims that the length of time between the crime and the in-court identification—more than five years—weighs strongly against a finding of reliability.

We conclude that the district court did not err in permitting the in-court identification. First, we agree with its conclusion that the in-court identification procedure was not impermissibly suggestive. Meyer does not argue that the procedure used at the in-court lineup on March 25, 2002, was itself suggestive; instead, he contends that Inspector Barrett's display of the single photograph of Meyer at the June 19, 2000 photo lineup was so suggestive that it rendered Shaw forever incapable of making an independent identification of the perpetrator. However, as the district court properly concluded, the facts indicate that Shaw's in-court identification of Meyer stemmed from his recollection of the incident rather than any recollection of the photograph shown to him by Inspector Barrett. Approximately a year and a half elapsed between the last photo lineup and Shaw's in-court identification of Meyer. Meyer's appearance at the time of the in-court lineup differed noticeably from his appearance in the photograph, and the in-court lineup was comprised of Meyer and seven men of similar age and appearance. In short, the identification process devised by the district court ensured that Shaw's in-court identification of Meyer was not tainted by Inspector Barrett's earlier display of the photograph.

Second, we agree with the district court's conclusion that, even if the procedure were impermissibly suggestive, the in-court identification was independently reliable. The first, second, and fourth of the *Biggers* factors weigh heavily in favor of reliability. Regarding the first factor, during the incident, which lasted between two and four minutes, Shaw observed the perpetrator at close range. The perpetrator opened the driver's side door of Shaw's postal truck, placed a gun "in [his] face," and demanded, "Give me the cash box." A conversation ensued, as Shaw denied having a cash box, the perpetrator directed him to the back of the truck, and the

perpetrator demanded the keys to the truck. Shaw "continue[d] to look at [the perpetrator] to determine if there would be an opportunity . . . to get away" before escaping through the back of the truck. That Shaw could not see the perpetrator's face for some fraction of the incident hardly undermines the conclusion that, for *Biggers* purposes, Shaw had an excellent opportunity to view the perpetrator.

The second and fourth *Biggers* factors also dictate a finding of reliability. Regarding the second factor, Shaw testified that he focused his attention on the perpetrator throughout the incident, first conducting a dialogue with the perpetrator and then studying him as he looked for an opportunity to escape. Contrary to Meyer's assertion, Shaw's concern for his safety did not distract his attention; if anything, it heightened his degree of attention as Shaw watched the perpetrator for an opportunity to escape. Finally, regarding the fourth factor, Shaw identified Meyer quickly and confidently during the in-court lineup, and, as discussed *supra*, Shaw's assurance did not appear to stem from his recollection of the photographs used in the impermissibly suggestive lineups.

As the district court concluded, the third and fifth *Biggers* factors cut in Meyer's favor. Regarding the third factor, the district court identified some minor discrepancies between Shaw's initial description of the perpetrator and Meyer's actual appearance. For example, Shaw placed the perpetrator's age at twenties to thirties, whereas Meyer was in his early forties at the time of the incident. Regarding the fifth factor, Shaw made his in-court identification more than five years after the crime. However, given the weight of the other factors, the district court properly concluded that, under the totality of the circumstances, Shaw's identification was independently reliable.

## 2. Sufficiency of the Evidence

The district court also properly denied Meyer's motion for judgment of acquittal. We review de novo a district court's denial of such a motion. *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002). We must determine "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). We do not "weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury." *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993) (citing *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989)). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)).

Meyer argues that the Government did not present sufficient evidence for the jury to find, beyond a reasonable doubt, that *he*—rather than someone else—robbed Shaw. He notes that the Government did not present any physical evidence—*e.g.*, finger prints or bullet fragments—connecting him to the crimes. He observes that, although press releases issued by the United States Postal Service at the time of the crimes reported that a padlock had been taken, Postal Inspector Barrett had no knowledge of the missing padlock, which was never found. Finally, he stresses that a witness informed Barrett that Patrick Hicks, an acquaintance of Meyer, had admitted to the crimes.[1]

---

[1] Meyer also impugns the credibility of two government witnesses, Jarmal Shaw and Sheri Dawn Goodwin. He asserts that Shaw's initial description of the perpetrator differed significantly from his actual appearance. He insinuates that Goodwin, his former girlfriend, testified

We are unpersuaded by Meyer's dissection of the Government's case. The Government was not obligated to proffer physical evidence, and it presented substantial evidence connecting Meyer to the crimes. For example, as discussed *supra*, Shaw identified Meyer as the perpetrator. Sherri Dawn Goodwin, Meyer's former girlfriend, testified (1) that she lent Meyer her red Jeep Cherokee, which had West Virginia plates, on the day of the crimes (Shaw testified that he had observed a red Jeep Cherokee with out-of-state plates in the vicinity of the robbery), (2) that Meyer returned with blood on his clothes and glass in his face (the window of Shaw's postal truck had been shattered), and (3) that later in the evening Meyer told her that he had robbed a postal truck and that his gun accidently went off during the robbery. Sandra Waddell, a roommate of Meyer at the time, testified that Meyer was bleeding and excited on the night of the robbery, and told others at the residence to "cool it" when they began discussing news reports of the crimes. Jack Osborne, an acquaintance of Meyer, testified that, on the night of the robbery, Meyer told him that he had shot a black man.[2]

In sum, viewing the evidence in the light most favorable to the prosecution, *Jackson*, 443 U.S. at 319, we conclude that a rational trier of fact could have found the essential elements of the crimes—including Meyer's identity as the perpetrator—beyond a reasonable doubt.

---

to avenge his refusal to send her money. However, as Meyer acknowledges, it is the jury's province to assess the credibility of witnesses. *United States v. Burns*, 298 F.3d 523, 534-35 (6th Cir. 2002).

[2] Significantly, both Goodwin and Osborne testified that Meyer stated that he had shot at a black man. The media had not reported the victim's race.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.

————————————

### DISSENT

————————————

R. GUY COLE, JR., Circuit Judge, dissenting. Because I believe: (1) that the in-court identification procedure was impermissibly suggestive; and (2) that the totality of the circumstances, using the five-part analysis set forth in *Biggers*, clearly demonstrates that the identification was not independently reliable, I respectfully dissent.

The majority correctly sets out the two-step analysis that must be undertaken when determining the admissibility of an identification, and also correctly notes the five *Biggers* factors that we are to consider in the second step of the analysis. However, I believe that the majority's application of the test to the facts of the present case is flawed.

### I.

First, we must consider whether the in-court identification procedure was impermissibly suggestive. I believe that it was. The district court made clear that the pre-trial photographic identifications were undoubtedly impermissibly suggestive. If we accept that the pre-trial photo identifications were impermissibly suggestive, as I think it is clear we must, the question becomes whether there is a principled basis for concluding that the in-court identification is not.

I am unable to find any principled distinction between the two. In stating that the in-court identification was not impermissibly suggestive, the majority essentially notes two factors which indicate that the identification was based on Shaw's recollection of the incident rather than on a recollection of the photographs. First, approximately a year and a half had elapsed between the last photo lineup and the in-court identification. Second, Meyer's appearance at the

time of the in-court lineup differed from his appearance in the photograph, and the district court's lineup included Meyer and seven men of similar age and general appearance. In actuality, neither of these reasons, independently or taken together, support the notion that the in-court identification was somehow unaffected by the prior taint.

While a year and a half had in fact elapsed from the last photo lineup to the in-court identification, over *five years* had elapsed since the commission of the crime. It seems logical to conclude that, while the taint of the suggestive photo lineups had dissipated with time, Shaw's ability to recognize the robber from the day of the crime itself had dissipated to an even greater degree. Indeed, it might more likely be presumed that, because of the lengthy amount of time that had elapsed between the offense itself and the in-court identification, Shaw was all the more likely to have lost his recollection of the event itself, and therefore replaced his memory of the perpetrator's appearance with images from the more recently viewed photographs.

Additionally, the fact that Meyer's appearance in court differed from his appearance in the prior photograph, and that the in-court staged lineup included seven other men of approximately the same appearance hardly leads to the inference the majority suggests. Meyer argues that the in-court identification was tainted by the improper photo arrays. The fact that Shaw was able to pick out the very gentleman improperly shown to him from photographs does nothing to demonstrate that the taint from these photographs was no longer present. Moreover, if Meyer's appearance indeed differed substantially from his appearance in the photograph, it is safe to assume that his appearance also differed at least as substantially from his appearance at the time of the crime. The majority fails to note how the nature of this lineup assuages concerns that Shaw was identifying the man he saw in the improperly suggestive photo arrays rather than the perpetrator of the crime.

Thus, the majority offers no legitimate rationale for distinguishing the in-court lineup from the pre-trial lineups with regard to the impermissibly suggestive nature of the identification. Because the photo lineups were improper, the in-court identification was therefore impermissibly suggestive as well. Thus, our focus should turn to applying the *Biggers* factors to determine whether the identification nevertheless was independently reliable.

## II.

The first *Biggers* factor is the opportunity of the witness to view the perpetrator at the time of the crime. While the majority finds that this factor weighs heavily in favor of reliability, my view, like the district court, is that this factor weighs only slightly in favor of reliability. While there is little question that the witness did have some opportunity to view the assailant, the encounter was not especially long, and for a substantial portion of the time Shaw was not in a position to observe the robber's face.

The district court additionally found that the second *Biggers* factor, the witness's degree of attention, "cuts only slightly in favor of admissibility." As the district court noted, Shaw's testimony indicated that he may have been focused as much on the gun itself as on the gunman's face, and he was somewhat preoccupied in his search for a way to escape the truck. Thus, I agree that this factor weighs slightly, at best, in favor of reliability.

The majority implies that the third factor, the accuracy of the witness's prior description, cut slightly against reliability. However, as the district court found, this factor was not nearly as tentative as the majority indicates. In fact, the district court stated that the *Biggers* factor weighed strongly against reliability. At the time of the crime, Meyer was in his early forties. The February 24, 1997, interview report indicates that Shaw described the suspect as a white male in his early thirties, and Shaw testified at the suppression

hearing that he originally believed that the suspect may have been in his twenties. As the district court also noted, Shaw described the suspect as having brown hair, but the 1998 photo of Meyer depicted a man whose hair did not match that description. Furthermore, Shaw's description of the gunman did not mention facial hair, but Meyer has a mustache in each of the subsequent photos. While Meyer's facial hair certainly could have grown in the interim, there was no indication that this was the case. I therefore agree with the district court that this factor should weigh heavily against reliability.

The fourth *Biggers* factor is the level of certainty demonstrated by the witness. The district court found that the fourth *Biggers* is the only one in which the analysis differs from the pre-trial identification to the in-court identification. According to the district court, this shift in the fourth factor was sufficient to tip the scale in favor of reliability. With regard to the out-of-court identification, the district court noted that Shaw testified that he was very certain of the identification, but took this certainty "with a grain of salt," mindful that he was shown the photo under extremely suggestive circumstances. However, because I believe that the in-court identification was also impermissibly suggestive, I think the certainty with which Shaw identified Meyer in court should be viewed with a similar degree of skepticism.

In addressing the fourth *Biggers* factor, the majority notes that "Shaw's assurance did not appear to stem from his recollection of the photographs used in the impermissibly suggestive lineups." But the majority provides no basis for this assertion. Indeed, I question what Shaw could have done–short of saying, "That's the guy I saw in the picture!"– to make his assurance "appear to stem from his recollection of the photographs." I am unable to see any logical basis to support the notion that Shaw's assurance was based on his recollection of the incident rather than his recollection of the tainted photo lineups.

Finally, the length of time between the crime and the confrontation, the fifth *Biggers* factor, weighs heavily against reliability. Despite the fact that the majority finds that this factor cuts only slightly in Meyer's favor, I believe that this factor weighs immensely against reliability–to an almost dispositive degree. In fact, in *Biggers* itself, the Supreme Court noted that a lapse of seven months between the date of the crime and the time of the confrontation would be "a seriously negative factor in most cases." 409 U.S. at 201. If a seven-month lapse is generally a "seriously negative factor," a five-year lapse must be considered exponentially more negative.

In considering the totality of the circumstances, the district court further supported the decision to suppress the pre-trial identifications as follows:

> [The district court] also finds relevant the fact that Shaw failed to identify Meyer in the second photo lineup. It is true that Meyer's appearance in that photograph, which was taken in 2000, is quite different from his appearance in the photograph Shaw eventually positively identified, which was taken in 1998. Even so, Shaw's initial failure to identify Meyer suggests that his opportunity to view the gunman at the time of the crime and his degree of attention to the gunman's appearance…were perhaps not as great as his testimony would otherwise suggest. If the gunman's face were truly as emblazoned in Shaw's memory as he believes it to be, it is unlikely that he would not recognize Meyer after studying the second photo lineup.

I agree fully with this analysis by the district court, and note that this assessment is equally applicable to the in-court identification.

Thus, the first, second, and fourth *Biggers* factors cut only slightly, if at all, in favor of reliability. The third and fifth factors, in contrast, weigh strongly against reliability.

Accordingly, it is my view that the in-court identification was impermissibly suggestive, not independently reliable, and should have been suppressed.

### III.

A conviction based on an identification that is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification violates the defendant's constitutional right to due process. *See Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986). I, therefore, would find that Meyer's right to due process has been violated, and would remand the case to the district court for a new trial untainted by an impermissibly suggestive and unreliable identification. Accordingly, we need not reach the second issue in this case, the denial of Shaw's motion for judgment of acquittal. In this regard, I simply wish to note my agreement with the majority that, with Shaw's identification admitted as evidence, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

### IV.

In sum, I would reverse the district court's denial of Meyer's motion to suppress and remand the case to the district court for a new trial.