NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0254n.06
Filed: April 2, 2009

Nos. 05-3620, 05-3622

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| JACK L. CLARK and DANIEL NIXON, | ) | |
| | ) | O P I N I O N |
| Defendants-Appellants. | ) | |

BEFORE:    GIBBONS and McKEAGUE, Circuit Judges; and SHADUR, Senior District Judge.*

**McKEAGUE, Circuit Judge.** Defendants Jack L. Clark and Daniel Nixon are two of eleven defendants named in a nine-count indictment filed in the Southern District of Ohio in September 1999. Clark was charged with six offenses and Nixon with four, all stemming from an alleged cocaine trafficking conspiracy in the Dayton area in the late 1990s. Clark and Nixon were tried together before a jury in October and November 2002 and were found guilty of all charged offenses. In May 2005, Clark and Nixon were both sentenced to 480-month prison terms. Both defendants now appeal, raising a total of nine claims of error. The claims of error identify irregularities, but defendants have failed to demonstrate the existence of errors that resulted in such prejudice as to warrant relief. We therefore affirm both defendants' convictions and sentences.

_____

*Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

## I. INDICTMENT

Seven of the nine counts included in the indictment related to defendants Clark and Nixon. Count I of the indictment charged all eleven named defendants with conspiring to distribute, and possess with intent to distribute, more than five kilograms of cocaine.

Count I described the conspiracy as involving, in relevant part: Clark's purchasing and arranging purchases of cocaine from suppliers within and outside the Southern District of Ohio; Clark's directing the distribution of cocaine to and by co-conspirators in the Dayton area; and the use of force and threats of force, including the use of firearms, by Clark and Nixon, in relation to the conspiracy.

Count II charged Clark with money laundering in connection with the purchase of real property.

Count III charged Clark and Nixon and others with traveling in interstate commerce from Dayton to Florida in furtherance of the conspiracy and in aid of a racketeering enterprise.

Count IV charged Nixon and others with possessing with intent to distribute seven kilograms of cocaine on February 6, 1998.

Count V charged Clark with attempting to possess seven kilograms of cocaine on February 6, 1998.

Count VII charged Clark and Nixon with using a firearm during and in relation to a drug trafficking crime.

Count IX charged Clark with money laundering in connection with the purchase of an automobile.

## II. CLAIMS OF ERROR

### 1. Seizure of Legal Papers (Clark and Nixon)

Prior to trial, on May 25, 2000, while Clark was detained in the Montgomery County Jail, authorities became aware of a plot to escape by inmates in the area where federal detainees were housed. As a consequence, inmates in that cell range were moved and their property was seized for inspection for evidence relating to the suspected plot. Clark was among those moved to a different facility. His property was seized and delivered to the FBI for investigation. Inspecting agents found no evidence of Clark's involvement in the escape plot. However, because some of Clark's papers bore writings suggesting his desire or intention to communicate with potential witnesses, the inspecting agents decided to turn the papers over to the FBI agent assigned to Clark's prosecution, Agent Thomas Mygrants, on June 5, 2000. On instruction from Assistant U.S. Attorney Margaret Quinn, Mygrants proceeded to inspect Clark's papers for evidence of witness intimidation or subornation of perjury. Mygrants found no such evidence, but he did use information gleaned from the papers to contact some witnesses. Also, Mygrants did report his findings to Assistant U.S. Attorney Quinn. When Clark advised his attorney of the seizure of his property, the matter was immediately addressed to the district court. On June 21, 2000, the court ordered all property returned to Clark within five days.

Clark subsequently moved the court to dismiss the indictment or for other appropriate sanctions, contending that his Fourth and Sixth Amendment rights had been violated by the

government's seizure and inspection of papers bearing notes of his trial preparations and defense strategy. Nixon joined in the motion. The district court agreed that the government had acted improperly and in violation of Clark's rights, but denied relief for lack of a showing of actual prejudice. The court reached this conclusion after conducting *in camera* review of some 811 pages of documents submitted by Clark. The court determined that some of the papers bore notes reflecting Clark's theory of his defense, "i.e., that he is an innocent man who is being held in jail without bond because of lies of so-called confidential informants, East Dayton 'crack heads' and federal and state law enforcement officers." Opinion and order, Oct. 2, 2002. p. 20, JA 556. Yet, the court concluded that Clark had failed to show how the government could have obtained any advantage by reading his papers. The court summed up its reasoning as follows:

> Simply stated, even if this Court were to assume that the Government learned from Clark's papers that he believed he was innocent, that the Government's witnesses were liars and that the government was without evidence, the Court cannot conclude that Clark suffered prejudice as a result.

*Id.* at 21, JA 557. The court therefore denied the motion for dismissal or other sanctions.

On appeal, the district court's factual findings are reviewed for clear error, but its determination whether the facts make out a violation of constitutional rights is reviewed de novo. *United States v. O'Dell*, 247 F.3d 655, 666 (6th Cir. 2001).

Defendants correctly observe that notes prepared by a defendant at his attorney's request in preparation for trial may be confidential information protected by the Sixth Amendment even though the notes were not communicated to the attorney. *Bishop v. Rose*, 701 F.2d 1150, 1157 (6th Cir. 1983). Yet, defendants are entitled to relief in connection with the prosecution's improper use of

such protected attorney-client information only if prejudice is shown. *See id.* at 1156-57; *United States v. Steele*, 727 F.2d 580, 586 (6th Cir. 1984) ("Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted."); *United States v. Jones*, 766 F.2d 994, 1001 (6th Cir. 1985) (same); *United States v. Griffith*, 756 F.2d 1244, 1250 (6th Cir. 1985) (same).

Indeed, the rule exemplified in Sixth Circuit case law is derived from *United States v. Morrison*, 449 U.S. 361 (1981), where the Supreme Court, without detracting from the fundamental importance of the right to counsel, recognized "the necessity for preserving society's interest in the administration of criminal justice." *Id.* at 364. Accordingly, the Court held that even in the case of a deliberate infringement of the Sixth Amendment right to counsel, "absent *demonstrable* prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate." *Id.* at 365 (emphasis added).

Defendants argue there are circumstances under which actual prejudice or a substantial threat thereof need not be shown. They maintain that prejudice may be adequately established merely through evidence that attorney-client information was communicated to the prosecution. Their best authority for this proposition is *Shillinger v. Haworth*, 70 F.3d 1132, 1141 (10th Cir. 1995). In *Shillinger*, the court found that a law enforcement official's disclosure of his personal observations of confidential attorney-client trial-preparation communications (i.e., courtroom trial preparation sessions) to the prosecution created such a strong likelihood of prejudice as to make out a *per se* Sixth Amendment violation. *Id.* at 1142. Defendants contend the *Shillinger* court excused compliance with the "demonstrable prejudice" requirement because there, as here, the evidence

showed that confidential information was improperly disclosed by a law enforcement officer to the prosecution.

Defendants overstate the significance of *Shillinger*. First, the facts presented in *Shillinger* are unique and clearly more egregious than those presented in this case. Not only was the government's intrusion into the defendant's attorney-client relationship more profound because it went to the heart of personal attorney-client communications regarding defense and trial strategy, but, as the court emphasized, the intrusion was both purposeful and groundless (i.e., lacking a legitimate law enforcement purpose). *Id.* at 1139-40. *Shillinger* is thus factually distinguishable and does not represent persuasive reason to depart from established Sixth Circuit precedent. Moreover, even though the *Shillinger* court recognized that the defendant's Sixth Amendment rights had been violated, despite an absence of demonstrable prejudice, the court did so, at least in part, based on its implicit finding of a substantial likelihood or "threat" of prejudice. *See id.* at 1139, 1142 (commenting on the likelihood of prejudice stemming from the circumstances).

Furthermore, although the *Shillinger* court held there was a Sixth Amendment violation, it stopped short of granting relief or prescribing an appropriate remedy. Rather, the court remanded the matter to the district court for an evidentiary hearing to determine the extent of the prosecutor's intrusion. Citing *Morrison*, 449 U.S. at 365-67, the court acknowledged that absent prejudicial effect, there is no basis for imposing a remedy, and further, that any remedy must be "tailored" so as to "neutralize the taint." *Shillinger*, 70 F.3d at 1142-43. The object of the remedy is to assure the defendant effective assistance of counsel and a fair trial, while at the same time avoiding unnecessary infringement of competing interests such as society's interest in the administration of justice. *Id.*

Careful scrutiny of *Shillinger* thus reveals it to be reconcilable with *Morrison* and not inconsistent with the approach adopted in the Sixth Circuit.

Here, in applying this approach, the district court correctly determined that law enforcement officials' retention and use of Clark's papers was improper. The court then properly undertook to ascertain the extent of the government's intrusion and the resultant prejudice to defendant Clark's rights. The district court conducted an *in camera* review of some 811 pages and found Clark's notes to be innocuous—affording no information that could be put to unfair advantage by the government. To the extent this determination rests on a finding of fact, it is reviewed only for clear error. Clark and Nixon have not even argued that the district court erred in this assessment. That is, even though the case proceeded to trial, defendants have been unable to identify how the prosecution took unfair advantage of information that came to its attention as a product of the jail investigation. Clark offers speculative arguments that disclosure of the notes may have contributed to difficulties in his attorney-client relationship and that Mygrants may have used information from his notes to persuade Clark's girlfriend to accept a plea agreement. Both arguments lack substantiation and fail to establish the required demonstrable prejudice or substantial threat thereof. We therefore conclude the district court did not err, but properly applied the controlling legal standard and properly denied defendants' motion to dismiss the indictment or for other sanctions.

## 2. Suggestive Pre-Trial Identification (Clark and Nixon)

One of Clark's suppliers of cocaine was Andrew Hetu of Key West, Florida. Hetu testified in trial that in 1997 and 1998, Clark made seven to ten purchases of cocaine from him, usually a quantity of about five kilograms per transaction. In most cases, Clark or his operatives accepted

delivery of the cocaine in Florida. On one occasion in 1997, Hetu drove from Florida to Dayton to make delivery of three kilograms of cocaine to Clark. Hetu was accompanied on this trip by a friend, Arnold Caballero. Caballero thought the purpose of the trip was to explore the prospect of selling used cars. While in Dayton, Hetu and Caballero met briefly at their hotel with a man introduced to Caballero as being in the car business. Caballero described him as a short, stocky white guy, wearing "street dress." In other words, he "didn't look businesslike." They spoke for a few minutes, but not about the car business. Caballero became uncomfortable and withdrew from the conversation and from the hotel, and flew back to Florida alone the next day.

During trial five years later, Caballero was asked if he could identify the man he had met briefly at the Dayton hotel in 1997. In preparation for such testimony, Assistant U.S. Attorney Richard Chema had offered Caballero the opportunity to view the man in the hallway outside the courtroom. Although Chema did not specifically identify the man for Caballero, when Jack Clark approached Caballero, drawing to within a few feet, and spoke to two women seated behind him, Caballero recognized him as the man he had met in Dayton. He looked "a little heavier" and "a lot cleaner," but Caballero recognized him by the sound of his voice. Caballero did not recall whether the man was wearing handcuffs as he passed him in the hallway, as he was focused on his face. Caballero then identified defendant Clark in the courtroom as the man he had met with Andrew Hetu at the Dayton hotel.

Clark objected to this testimony at trial, contending the pre-testimony identification procedure used by the prosecution was unduly suggestive. The district court agreed that the identification procedure was unduly suggestive but nonetheless denied the oral motion in limine.

The court found that Caballero had an independent basis for identifying Clark, i.e., recognizing him by general physical appearance and by the sound of his voice. In a supplemental record, the district court further explained its ruling. The court observed that although Caballero's encounter with the man at the hotel had been brief, he was not shown to have been under stress at the time or otherwise distracted. Yet, the man made such an impression on Caballero as to prompt an immediate change in his plans and his immediate return to Florida. The court characterized Caballero's courtroom identification of Clark as "appear[ing] to be definite."

Defendants Clark and Nixon insist that the district court erred in this regard. The district court's ruling is reviewed de novo because the question whether identification evidence was sufficiently reliable to not offend the defendant's due process rights is a question of law. *United States v. Meyer*, 359 F.3d 820, 824 (6th Cir. 2004). To the extent the ruling implicates fact finding, however, the district court's findings are upheld unless clearly erroneous. *Id.*

A defendant's right to a fair trial is implicated only when identification testimony is premised on an identification procedure "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* (quoting *Thigpen v. Corey*, 804 F.2d 893, 895 (6th Cir. 1986)). "As long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given the identification." *Id.* (quoting S*mith v. Perini*, 723 F.2d 478, 482 (6th Cir. 1983)). The *Meyer* court described the required analysis as follows:

> First, the defendant bears the burden of proving that the identification procedure was impermissibly suggestive. . . . Second, if the defendant meets this burden, the court evaluates the totality of the circumstances to determine whether the identification was

> nevertheless reliable. . . . The following factors guide the court's reliability analysis: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty when identifying the defendant at the confrontation; and (5) the length of time between the crime and the confrontation.

*Meyer*, 359 F.3d at 824 (citations omitted).

In evaluating the totality of the circumstances, the district court expressly considered these factors. The court recognized that it was a close question, but concluded that Caballero's identification of Clark was reliable. In challenging this conclusion, defendants emphasize that Caballero had initially observed Clark only for a few minutes at the Dayton hotel, and that encounter happened five years prior to his testimony.

Defendants' argument is not groundless, but they fail to demonstrate that the district court erred in its evaluation of the totality of the circumstances. The district court had the opportunity to observe Caballero's demeanor and level of certainty. Defendants have identified no sound reason for us to second-guess the district court's finding that Caballero's testimony was sufficiently reliable to be admissible for the jury's consideration. Nor have they shown that the district court erred in holding there was no substantial likelihood of misidentification. Moreover, as the government points out, the role of Caballero's testimony, identifying this connection between Hetu in Florida and Clark in Dayton, was minimal. We therefore conclude that even if we were to disagree with the district court's assessment and find error, the error was harmless, because there was overwhelming evidence of Clark's connection to Hetu in the conspiracy.

In sum, defendants have failed to show that admission of Caballero's testimony implicated such a "substantial likelihood of irreparable misidentification" that they were denied a fair trial in violation of due process. *See Meyer*, 359 F.3d at 824. We therefore deny this claim of error.

### 3. Prejudicial Evidence of Violence (Clark and Nixon)

Both defendants also complain of admission of evidence bearing little relevant relation to the charged conspiracy but carrying a substantial likelihood of unfair prejudice. The district court's evidentiary rulings are reviewed for abuse of discretion. *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005). "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overturned." *Id.* (quoting *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir. 1995)).

In particular, defendants take issue with the admission of evidence of co-conspirators' involvement in "home invasion" robberies of other drug dealers, including graphic evidence of violence perpetrated and the injuries that resulted. Defendants point to evidence of (1) a home invasion robbery of the Vanderpool family by Nixon, Johnny Ray Brandenburg and Bruce Young; and (2) a shooting of Roger Wax that occurred while Clark, Nixon, Brandenburg and Young were planning another robbery. Clark insists there is no evidence he had any involvement in the former robbery and that Wax's shooting was unrelated to any home invasion robbery.

Yet, as the government points out, the indictment expressly alleges that Clark and Nixon and others used force and threats of force "to collect payment of drug debts, to rob other individuals of drugs and/or money, to ensure the loyalty of co-conspirators, to intimidate potential witnesses, and to avoid detection and criminal prosecution." The government also argues that the evidence of these

crimes was not extrinsic evidence. Rather, these other crimes were committed by co-conspirators and shown to be linked to the charged conspiracy.

Indeed, Nixon was involved in both incidents, Clark was involved in the latter, and both incidents were related to maintenance of the charged conspiracy. The evidence is therefore properly deemed admissible as *res gestae* evidence, i.e., evidence of "other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). It represented background evidence having a "causal, temporal or spatial connection with the charged offense" and helped define the scope of the charged conspiracy. *United States v. Martinez*, 430 F.3d 317, 335 (6th Cir. 2005) (quoting *Hardy*, 228 F.3d at 748). In denying defendants' motion for new trial, the district court explained why it found this evidence of violence sufficiently related to the charged conspiracy, and the admission of the evidence has not been shown to be an abuse of discretion.

Defendants maintain that even if the evidence had marginal relevance to the charged offense, the probative value was substantially outweighed by the risk of unfair prejudice—especially considering the detailed evidence of victims' injuries and trauma introduced by the government. Granted, when confronted with photographic evidence of Wax's gunshot injuries, the district court disallowed them for this very reason. Yet, as the government argues, the other evidence now complained of was objected to by defendants only on the basis that it was not relevant because it related to other conspiracies. Defendants' present objection, that the graphic evidence of injuries was unfairly prejudicial because of its potential to inflame the sympathies of the jury, was not

specifically addressed to the trial court and was therefore forfeited. It follows that the issue is now subject to review only for plain error, requiring a showing that defendants' substantial rights were affected. Fed. R. Crim. P. 52(b).

The record confirms that defendants did not raise this specific objection below as to the evidence now in question. When they did, as to photographic evidence of Wax's injuries, the district court sustained it and disallowed the evidence as cumulative of Wax's testimony and as having insufficient probative value to outweigh its potential prejudicial effect. If the district court had been confronted with an objection, it might well have limited the other evidence, too. Yet, review of the evidence identified by defendants reveals that, while it may not all have been strictly necessary to the government's case, neither was it unduly emphasized by the government. Even if some of the evidence could or should have been limited, its admission can hardly be deemed to make out plain error affecting substantial rights. *See United States v. Thomas*, 11 F.3d 620, 630 (6th Cir. 1993) (defining "error affecting substantial rights" as one that affected the outcome in the court below). Nor can any error be deemed to have satisfied the additional prerequisite to plain error relief, i.e., a showing that it "seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Martin*, 438 F.3d 621, 628 (6th Cir. 2006) (quoting *Thomas*, 11 F.3d at 630).

Accordingly, defendants' claim of error based on the district court's admission of graphic evidence of violence is denied.

**4. Witness Intimidation (Clark and Nixon)**

Aggrieved by the fact that the prosecution's case is built almost entirely on the testimony of cooperating co-defendants, Clark and Nixon have continuously maintained that the government secured such cooperation through improper intimidation and coercion. At the conclusion of the trial, the district court denied defendants' motion to dismiss the indictment on this basis. The court observed that "the government certainly was zealous in its activities," but found that the government had not engaged in cognizable misconduct. The court further found that defendants had not demonstrated any actual prejudice resulting from the government's alleged overreaching.

Government misconduct that amounts to substantial interference with a witness's free and unhampered determination to testify may be deemed a violation of due process. *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997). Such misconduct amounting to witness intimidation will not justify a new trial, however, unless the defendant demonstrates that it was not harmless. *Id.*; *United States v. Stuart*, 507 F.3d 391, 398 (6th Cir. 2007).

Defendants object to the government's efforts to induce witnesses to testify against them in exchange for lenient treatment. Not surprisingly, defendants cite no authority for the proposition that this represents government misconduct. To the contrary, the legitimate prerogative of the government to elicit truthful testimony through promises of leniency or of dismissal or reduction of charges is well-recognized and well-established. *United States v. Ware*, 161 F.3d 414, 419-20 (6th Cir. 1998) ("In carrying out his legitimate business it has always been properly within the prosecutor's prerogatives to offer these kinds of promises in return for a benefit to the government, often in the form of the defendant's cooperation.").

Defendants Clark and Nixon maintain that Roy Johnson identified them as his assailants (Johnson having been shot at close range in the right knee and the right foot) only after Detective Kirk Bell confronted him with the choice to "be a witness or a suspect in the case." Until Bell put the question to him in this way, Johnson had been unwilling to identify his assailants for fear of further reprisals. Their identity was no mystery to Johnson; he was well-acquainted with Clark and Nixon. That Clark and Nixon were in fact the shooters was corroborated by the testimony of Daniel Weber, who had been present during the shooting. There is no evidence that Bell's comment inducing Johnson to disclose who shot him precipitated false testimony. It follows that Bell's comment has not been shown to represent any kind of improper witness intimidation and has not been shown to have resulted in any actual prejudice to defendants' right to a fair trial.

Defendants also question tactics used by the police when they, in a heavy-handed manner, executed a search warrant at the home of Clark's sister, Rhonda Winningham. She testified that the police descended on her and her family from the surrounding woods with guns drawn, ordering her and her husband to the ground, and handcuffing them in the presence of children. Yet, the primary purpose of the search was to recover firearms. And defendant Clark, who had a reputation for violence, was present at the time, and was in fact found to be in possession of a firearm. In addition, seven other firearms, ammunition and knives were seized during the search. It was a patently dangerous situation. Moreover, irrespective of whether defendants have raised a question regarding the reasonableness of police tactics, they clearly have failed to establish official misconduct resulting in witness intimidation that caused them actual prejudice.

**5. Prosecutorial Misconduct (Clark and Nixon)**

- 15 -

Defendants contend Assistant U.S. Attorney Richard Chema engaged in prosecutorial misconduct during his rebuttal closing argument. They identify a single statement as flagrantly and prejudicially improper: "No explanation has been furnished as to why the Government is either so evil or so stupid that we can't find the right guy. . . ." Trial tr., Nov. 22, 2002, p.236, JA 7317. Quoting from *Washington v. Hofbauer*, 228 F.3d 689, 702 (6th Cir. 2000), defendants contend it is "improper for a prosecutor to suggest that a defendant is guilty merely because he is being prosecuted or has been indicted." Because defendants did not object to the statement during trial, the government correctly contends the issue is reviewed only for plain error. *United States v. Davis*, 514 F.3d 596, 614-15 (6th Cir. 2008).

"Prosecutorial misconduct may be so exceptionally flagrant that it constitutes plain error." *Id.* at 614 (quoting United States v. Carter, 236 F.3d 777, 783 (6th Cir. 2001)). However, a verdict will not be overturned based on improper comments of the prosecutor unless the misconduct was "so pronounced and persistent that it permeated the entire atmosphere of the trial" or was "so gross as probably to prejudice the defendant." *Id.* (quoting *United States v. Tocco*, 200 F.3d 401, 421 (6th Cir. 2000)). A comment may be improper if it is calculated to incite the passions and prejudices of the jury or if it is designed to completely undercut the sole defense theory. *Id.* at 613. Determining flagrancy entails consideration of four factors: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength

- 16 -

of the evidence against the defendant." *Id.* at 613 (quoting *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006)).

Here, viewing Chema's isolated statement in context, it is clear that it was not improper, flagrant, prejudicial or injurious to the fairness, integrity or public reputation of the judicial proceedings. The statement was not calculated to incite the passions or prejudices of the jury. It was a legitimate response to the defendants' charge that the prosecution was part of a government vendetta against defendants whereby all the cooperating witnesses were persuaded to give false testimony to obtain more lenient treatment for themselves. Chema's statement merely pointed out the utter lack of evidence supporting the charge that the prosecution was fueled by evil motive or incompetence. It did not permeate the entire proceeding with unfairness and there is no reason to believe, in the face of the strong evidence of defendants' guilt, that it prejudicially misled the jury. The statement does not rise to the level of plain error.

### 6. Suppression of Evidence:  Illegal Stop (Nixon)

Defendant Nixon contends the district court erred when it denied his pretrial motion to suppress evidence seized from a rental van on February 6, 1998. The van was being driven by co-defendant Daniel Weber when it was pulled over by police on Interstate I-675 in Dayton. Nixon and co-defendant Jason Vitale were among several passengers. Shortly after it was pulled over, the van was subjected to a dog-sniff inspection. When the police dog's positive alert indicated the presence of drugs, a search warrant was obtained. The search uncovered seven kilograms of cocaine, which had recently been purchased by Clark and friends from Andy Hetu in Florida. Nixon maintains the

van was unlawfully pulled over without reasonable suspicion, in violation of his Fourth Amendment rights, and that the fruits of the ensuing search should have been suppressed.

The district court denied Nixon's motion because (1) he lacked standing to challenge the search (i.e., Nixon had not rented the van and was not listed as an authorized driver in the rental agreement, and he was therefore deemed to have no reasonable expectation of privacy in the van); and (2) considering the totality of the circumstances known to the officers, they had reasonable suspicion to make a *Terry* stop.

On appeal from the denial of the suppression motion, this court reviews factual findings for clear error and legal conclusions de novo. *United States v. Perez*, 440 F.3d 363, 365-66 (6th Cir. 2006). The court must consider the factual evidence in the light most favorable to the government. *Id.* at 366. "Determinations regarding reasonable suspicion and probable cause generally should be reviewed *de novo*, while giving 'due weight' to the factual inferences drawn by the district court." *Id.*

On appeal, Nixon correctly contends that he does have standing, as an occupant of the vehicle, to challenge the *Terry*-stop seizure. *See Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2405-07 (2007) (holding that passenger in vehicle subject to traffic stop is, by his passive submission, deemed seized, assuming a reasonable person would not feel free to leave the scene); *Perez*, 440 F.3d at 369 (reasonableness of traffic stop seizure of vehicle may be challenged both by driver and any occupant of vehicle). He also contends the district court erred in its assessment of the facts said to support reasonable suspicion.

It is undisputed that the officers did not stop the van because they had witnessed a traffic violation. They had been following the van for some time, recognized at least two of the occupants, and pulled the van over based on their suspicion that drug trafficking was afoot. Determining whether they had "reasonable suspicion" is governed by standards well-summarized in *Perez*:

> [A] moving vehicle may be stopped to investigate an officer's reasonable and articulable suspicion that its occupants had engaged, were engaging, or were about to engage in criminal activity. *United States v. Hensley,* 469 U.S. 221, 226-27, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Courts must determine from the totality of the circumstances whether law enforcement had an objective and particularized basis for suspecting criminal wrongdoing. *United States v. Arvizu,* 534 U.S. 266, 272, 273-77, 122 S.Ct. 744 (2002); *United States v. Orsolini,* 300 F.3d 724, 728-29 (6th Cir.2002).
>
> . . . .
>
> While reasonable suspicion must be based on more than "ill-defined hunches," officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744 (quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). In considering the totality of the circumstances, "we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Smith,* 263 F.3d 571, 588 (6th Cir.2001) (citing *United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581 (1989)).

*Perez*, 440 F.3d at 370-71.

Before ruling on the motion to suppress, the district court conducted a substantial evidentiary hearing. As Nixon points out, the record demonstrates that the officers had not observed any illegal or unusual suspicious conduct by the occupants of the van. Yet, what they did observe—members of a suspected Dayton area drug-trafficking enterprise, apparently returning to Dayton in a rental van (their customary way of conducting business) from Florida (known to be a drug supply source for

the enterprise)—were actions entirely consistent with the enterprise's *modus operandi*, as described

to the officers by more than one confidential informant. Considering the totality of the

circumstances, and respecting the prerogative of trained and experienced officers who had been

investigating this suspected enterprise for some months to draw reasonable inferences based on their

observations, it is clear they were not relying merely on an "ill-defined hunch." The district court

did not err in finding that reasonable suspicion was established.

Nixon contends the district court misconstrued the teaching of *United States v. Arvizu*, 534

U.S. 266, 273-74 (2002). It is true that the driver and occupants of the vehicle stopped in *Arvizu*,

unlike the subjects in this case, exhibited some innocent but slightly unusual behaviors immediately

prior to the stop. *Id.* at 269-70. Yet, these observations hardly played a prominent role in the

Court's analysis. The primary teaching of *Arvizu* emphasizes consideration of the *totality* of the

circumstances and deference to the reasonable judgments of experienced and trained officers.

Nixon's argument cuts directly against the grain of this teaching. It is akin to the very reasoning

which *Arvizu* rejects. In *Arvizu*, the Supreme Court reversed the lower court decision to suppress

evidence, concluding that it had engaged in a "sort of divide-and-conquer analysis," improperly

evaluating various circumstances in isolation and according them "no weight" because each, standing

alone, was susceptible to an innocent explanation. *Id.* at 274. Here, as in *Arvizu*, "[a]lthough each

of the series of acts was 'perhaps innocent in itself,' . . . taken together, they 'warranted further

investigation.'" *Id*. (quoting *Terry v. Ohio*, 393 U.S. 1, 22 (1968)). *See also Perez*, 440 F.3d at 371

(taking the circumstances together and giving due weight to reasonable inferences drawn by agents

based on their experience). We therefore uphold he district court's decision to deny the suppression motion.

### 7. Sufficiency of Evidence (Nixon)

Nixon also argues the trial evidence was insufficient to support his convictions for conspiracy to distribute cocaine (Count I), carrying and using a firearm during and in relation to the conspiracy (Count VII), and traveling in interstate commerce to facilitate the conspiracy (Count III). The sufficiency of the evidence challenge poses the question "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Conatser*, 514 F.3d 508, 518 (6th Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). The reviewing court does not weigh the evidence, assess the credibility of the witnesses or substitute its judgment for that of the jury**.** *Id.* All reasonable inferences must be drawn in favor of the jury's verdict. *Id.*

The trial testimony, when viewed in the light most favorable to the prosecution, clearly affords ample support for the jury's verdict. Nixon's counter-arguments are feeble. He contends first that the government's evidence failed to prove that he joined the charged conspiracy. To establish a conspiracy, no proof of a formal agreement is required; "a tacit or mutual understanding among the parties will suffice." *Id.* (quoting *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989)). "Just as the conspiracy may be inferred from circumstantial evidence, a defendant's knowledge of and participation in a conspiracy also may be inferred from his conduct and established by circumstantial evidence." *Id.* Nixon's suggestion that he was shown to be no more than a buyer

or seller of drugs who touched the conspiracy but never joined it is belied by evidence of his pervasive involvement in various aspects of the conspiratorial activities. A rational trier of fact could certainly find that Nixon had joined the conspiracy.

Nixon also argues that evidence of his participation, with Clark, in the shooting of Roy Johnson is insufficient to prove that he used a firearm during and in relation to the drug-trafficking conspiracy. He contends the shooting was not during and in relation to any drug transaction. The case Nixon relies on, *United States v. Gibbs*, 182 F.3d 408, 426 (6th Cir. 1999), is distinguishable in that it involved the use of a firearm to commit a robbery using the false allure of a drug sale. Because there was no drug sale, the use of the firearm was deemed not to have been during and in relation to a drug trafficking crime. Here, in contrast, the predicate offense is a drug trafficking conspiracy, not a particular drug transaction. There was evidence demonstrating that Clark's and Nixon's shooting of Johnson was precipitated by his nonpayment for drugs delivered to him earlier in the course of the continuing conspiracy. The use of the firearm thus furthered the purposes of the ongoing drug trafficking conspiracy. *See United States v. Warwick*, 167 F.3d 965, 971 (6th Cir. 1999) ("To establish that a firearm was carried 'in relation to' a drug trafficking offense, the evidence must support a finding that the firearm furthered the purpose or effect of the crime and that its presence or involvement was not the result of coincidence.").

Nixon's challenge to his conviction for traveling in interstate commerce to facilitate the conspiracy is based on the alleged inaccuracy of the date charged in the indictment. Even assuming the admissibility of the drugs seized from the van he was riding in on February 6, 1998, Nixon contends there is no evidence proving that he traveled interstate on or about January 20, 1998. This

argument is adequately refuted by evidence that the trip to Florida that culminated on February 6, 1998, actually began in January, as much as three or more weeks earlier. This evidence adequately supports a finding that the interstate travel occurred "reasonably near" or "on or about" January 20, 1998. *See United States v. Hettinger*, 242 F. App'x. 287, 295 (6th Cir. 2007); *United States v. Rashid*, 274 F.3d 407, 414-15 (6th Cir. 2001); *United States v. Manning*, 142 F.3d 336, 339-40 (6th Cir. 1998).

Accordingly, we reject Nixon's sufficiency-of-the-evidence arguments.

### 8. Undisclosed *Brady* Material (Nixon)

Nixon contends the government breached its duty to disclose *Brady* materials. The argument is based on statements included in both Clark's and Nixon's initial presentence reports that are attributed to persons who, as prosecution witnesses, testified differently in trial. Nixon *assumes* that the government had knowledge of the witnesses' inconsistent statements, knew the defense could have used them for impeachment purposes, and yet failed to disclose them. The district court addressed this issue comprehensively in connection with sentencing proceedings and denied relief, concluding that the supposed impeachment evidence was not "material."

Nixon has "the burden of showing that the Government suppressed evidence, that such evidence was favorable to the defense, and that the suppressed evidence was material." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). This "materiality" element requires a showing that there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 474 U.S. 667, 682 (1985)).

The district court carefully considered the asserted discrepancies in the witnesses' statements and concluded that none of them, viewed individually or collectively, were sufficiently significant to warrant the belief that disclosure of the allegedly withheld evidence would have created a reasonable probability of a different outcome. The district court's reasoning is clear and persuasive. Nixon has presented no basis for concluding that the district court erred in this regard.

### 9. Procedurally Unreasonable Sentence (Nixon)

Finally, Nixon contends the procedure by which the district court arrived at a prison sentence of 480 months was procedurally unreasonable in three different ways. The court reviews the sentence for reasonableness under an abuse-of-discretion standard. *Gall v. United States*, 128 S.Ct. 586, 594 (2007). To obtain relief, Nixon must show that the sentence is either procedurally or substantively unreasonable. *Id*. at 597; *United States v. Vowell*, 516 F.3d 503, 509-10 (6th Cir. 2008). Nixon does not contend his sentence is substantively unreasonable. A sentence may be held procedurally unreasonable if it is marked by "significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall*, 128 S.Ct. at 597.

Nixon contends the district court, in calculating the appropriate advisory Sentencing Guidelines range, made a finding regarding the quantity of cocaine attributable to him, 35 kilograms, that was never admitted by him or found by the jury, which allowed the court to impose a sentence above the statutory maximum that would otherwise have applied. This, Nixon contends, was clear

legal error, citing *Cunningham v. California*, 549 U.S. 270, 274 (2007). In response, the government correctly points out that the jury, by finding Nixon guilty of the Count I cocaine distribution conspiracy charge and the Count IV cocaine possession charge, necessarily found him responsible for possession of the seven kilograms seized from the van on February 6, 1998. As a consequence of this finding of fact, Nixon was properly sentenced under 21 U.S.C. § 841(b)(1)(A), which expressly requires a prison sentence of not less than ten years or more than life for an offense involving five or more kilograms of cocaine. The sentencing court's finding that Nixon was actually responsible for 35 kilograms did not, therefore, allow the court to impose a sentence in excess of the statutory maximum that would otherwise apply. Accordingly, the sentence was not, in this respect, procedurally unreasonable.

Next, Nixon argues that the district court also engaged in improper fact finding when it enhanced his sentence based on the finding that he discharged a firearm during and in relation to the drug trafficking conspiracy. After all, the jury had convicted him under Count VII only of having carried and used a firearm. As a consequence of the court's finding, the mandatory minimum prison sentence increased from five years to ten years under 18 U.S.C. § 924(c)(1)(A)(iii). Controlling case law now makes it clear, however, that this is entirely proper. The finding that a firearm used in relation to a qualifying offense was actually discharged is a sentencing factor, rather than an element of the crime, which the sentencing judge is permitted to find based on a preponderance of the evidence. *Harris v. United States*, 536 U.S. 545, 567-68 (2002); *United States v. Thompson*, 515 F.3d 556, 564 (6th Cir. 2008).

Lastly, Nixon complains that the district court gave an inadequate explanation of its evaluation of the 18 U.S.C. § 3553(a) sentencing factors when imposing the sentence of 480 months. The argument is meritless. Of the 480 months, 120 months are attributable to the mandatory minimum sentence imposed for the Count VII firearm offense. The remaining 360 months is a term of imprisonment that falls in the lower half of the properly calculated advisory Guidelines range, 324 to 405 months. As the 360-month sentence is within the range, it is entitled to a rebuttable presumption of reasonableness. *United States v. Vonner*, 516 F.3d 382, 389-90 (6th Cir. 2008 ) (en banc). Moreover, the district court's explanation of its consideration of the § 3553(a) factors is clearly adequate to enable meaningful review and "demonstrates that the sentencing court addressed the relevant factors in reaching its conclusion." *United States v. Dexta*, 470 F.3d 612, 614-15 (6th Cir. 2006). The sentence is not shown to be procedurally unreasonable simply because the court failed to engage in a "rote listing" or "ritualistic incantation" of the relevant factors. *Id.* at 615. Moreover, Nixon has not even identified a single sentencing factor which, if more explicitly considered, would or ought to have produced a more lenient sentence.

We thus find all three of Nixon's procedural unreasonableness objections to be meritless.

### III. CONCLUSION

For all of the foregoing reasons, we deny all nine claims of error asserted by defendants Clark and Nixon. Their convictions and sentences are **AFFIRMED** in their entirety.