**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0351n.06

**No. 07-6179**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

*Apr 03, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| RICHARD ALLEN WASHAM, | ) | WESTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

Before: MERRITT, CLAY and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. A federal jury convicted Richard Washam of robbing a bank in Kentucky twice within a one-month period. We affirm.

I.

On March 26, 2003, a slender black man wearing a dark hooded windbreaker walked into a U.S. Bank in Bowling Green, Kentucky. He approached a teller, pulled out a gun and demanded money, walking away with $4,257 in cash. Twenty-nine days later, someone matching the same description walked into the same bank, approached a teller, pulled out a gun and demanded money. This time he walked away with $4,615 in cash. After the second robbery a bank employee saw the suspect drive away in a cream-colored Mazda sedan with a license plate starting with the digits 2-1-3.

Several weeks later, Richard Washam robbed a PNC Bank in Florence, Kentucky. Wearing a dark hooded windbreaker, Washam approached a teller, pulled out a gun and demanded money. A bank employee saw Washam drive away in a tan Ford Explorer and reported this fact to the police, who caught Washam within minutes. Officers found cash, a dark blue hooded windbreaker and a handgun in Washam's car. Washam confessed and told an FBI agent that he robbed the bank to support his cocaine addiction. He pled guilty to robbing the Florence bank and to an accompanying gun charge.

Because Washam matched the description of the earlier robber, the FBI showed a photo array, containing Washam's picture among the pictures of others, to the witnesses from the Bowling Green robberies. Three witnesses, including the two tellers whom the robber confronted, identified Washam as the perpetrator. The FBI also learned that, just a few days after the second Bowling Green robbery, Washam sold a car matching the description of the getaway car, a cream-colored Mazda sedan with a license plate starting with the digits 2-1-3, and purchased the tan Ford Explorer that he used as a getaway car after the Florence robbery.

Based on this evidence, a federal grand jury indicted Washam on a slew of bank robbery and firearms offenses. A jury convicted Washam on two counts of bank robbery, 18 U.S.C. § 2113(d), and two counts of using a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A). The district court imposed concurrent 77-month sentences for the two bank robbery counts and consecutive 300-month sentences for the two firearms counts. The total sentence was 677 months.

II.

*Pretrial Identifications*.  Before trial, Washam moved to suppress identifications from the three eyewitnesses who fingered him as the Bowling Green robber from a photo array, arguing that the suggestiveness of the photo array made the identifications unreliable.  The Constitution generally "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, 565 U.S. ___, 132 S. Ct. 716, 723 (2012).  But the Supreme Court has carved out a narrow exception from this general rule for eyewitness identifications:  Due process prohibits the introduction of such evidence "if the . . . identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).  To exclude such identifications, a defendant must show that the identification procedure was unduly suggestive and the identifications were not otherwise reliable. *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

The district court agreed with Washam that the photo array was unduly suggestive, as Washam's picture was the only one that matched the suspect's description.  Yet the court held that the identifications were reliable after conducting a lengthy evidentiary hearing on the point.  Whether an identification is reliable turns on (1) the witness's opportunity to view the criminal, (2) his degree of attention, (3) the accuracy of his prior descriptions, (4) how certain he was when he made the identification and (5) the length of time between the crime and the identification. *Biggers*, 409 U.S.

at 199–200. After hearing from all three witnesses, the district court found that they each had a sufficient opportunity to view the robber, that they "all paid a fair amount of attention," that their descriptions of the robber "were all fairly accurate," that they were "[a]ll fairly definite about" their identifications, and that the lapse of two months between the robberies and the identifications was "insignificant." JA 207. We see no clear error in these five factual findings, and thus we agree with the district court's conclusion that the identifications were reliable. *See United States v. Meyer*, 359 F.3d 820, 824 (6th Cir. 2004).

It is true, as our colleague points out, that only one of the three witnesses who identified Washam from the photo array also positively identified him at trial. But the trial took place more than three years after the robberies, making it unsurprising that some witnesses' memories would fade in the interim. Also unsurprising is that Washam's appearance had significantly changed in the interim: he had a shaved head and a goatee at the time of the robbery, but he had a full head of hair and a full beard at trial. Rather than calling into question the reliability of these witnesses' far-more-immediate pretrial identifications, this case shows why pretrial identifications sometimes have greater evidentiary value than in-court identifications. *See United States v. Hines*, 470 F.2d 225, 228 (3d Cir. 1972); *accord Gilbert v. California*, 388 U.S. 263, 272 n.3 (1967). Indeed, although they could not identify Washam in court, the two other witnesses testified they were confident about the identifications they made from the photo array at the time they made them.

Washam separately argues (through a pro se brief) that his attorney performed ineffectively during the hearing on the eyewitness identifications because (1) he did not ensure that Washam was

present at the hearing, and (2) he did not call Dr. Solomon Fulero, an expert on cross-racial identifications, as a witness. As a general rule, we do not consider ineffective-assistance claims on direct appeal; we usually wait to consider them in post-conviction proceedings under 28 U.S.C. § 2255. *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990). Yet Washam's claims fit within an exception to the rule, as this record "is adequate to assess" the claims on the merits. *Id.*

Washam, first of all, was not present during the evidentiary hearing because he asked not to be there. His attorney filed a motion before the hearing asking that Washam be excused so that the witnesses, whose eyewitness identifications Washam was challenging, would not see him in court. The district court confirmed with Washam's attorney at the start of the hearing that Washam did not wish to be there. Washam responds that his attorney lied and that he wanted to be at the hearing, but the district court credited the attorney's contrary statement. No error occurred, and, even if that were not the case, Washam offers no theory of prejudice.

Neither was Washam's attorney ineffective for failing to call Dr. Fulero as an expert witness. Dr. Fulero offered extensive testimony about the (un)reliability of eyewitness identifications during the trial itself. In rejecting Washam's motion for a new trial, the district court reviewed the eyewitnesses' testimony from the evidentiary hearing in light of Dr. Fulero's trial testimony and concluded that it still would have admitted the identifications even if Dr. Fulero had testified. We thus need not decide whether the failure to call Dr. Fulero amounted to deficient performance because Washam cannot demonstrate prejudice.

Washam attacks the district court's refusal to instruct the jury that cross-racial identifications are inherently suspect. Jury instructions regarding eyewitness identifications "are within the discretion of the trial court," and special instructions "need only be given if there is a danger of misidentification due to a lack of corroborating evidence." *United States v. Jackson*, 347 F.3d 598, 607 (6th Cir. 2003). In this instance, other evidence corroborated the three identifications—at a minimum because each identification confirmed the other and because evidence connected Washam to the getaway car from the Bowling Green robberies. No abuse of discretion occurred.

*Evidence of the Florence Bank Robbery*. Washam argues that the district court erred by admitting evidence that he robbed the PNC Bank in Florence just a few weeks after the Bowling Green robberies. (Washam had already pled guilty to that crime.) Rule 404(b) of the Federal Rules of Evidence bars admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Washam does not deny that he robbed the Florence bank, permitting the admission of this evidence so long as (1) it has a valid use other than proving Washam's character and (2) it is not more prejudicial than probative under Rule 403. *United States v. Poulsen*, 655 F.3d 492, 508 (6th Cir. 2011).

The evidence of the Florence robbery served at least two non-propensity purposes. In the first place, it showed motive. After his arrest, Washam admitted to an FBI agent that he robbed the Florence bank to support his cocaine addiction. Evidence of a defendant's drug addiction is "extremely probative" of his "motive" for committing a robbery. *United States v. Cody*, 498 F.3d

582, 591 (6th Cir. 2007). That probative force is even greater where the defendant admits that, within weeks of the crimes, he committed a similar crime in order to support the same addiction.

In the second place, this evidence helped (though less so) to show identity. The similarities between the Bowling Green and Florence robberies suggest that the same person with the same mode of operation committed all three of them. Although other crimes need not "be identical in every detail" to establish a pattern, the probative force of those crimes depends on the extent to which they share "sufficient distinctive similarit[ies]" with the other crimes charged. *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006). All three robberies shared similarities, some of which could be called distinctive. In each case, the robber approached the teller in a friendly way, acted by himself, made no attempt to go over the counter, wore a dark blue or black windbreaker with a hood and held the gun with his left hand and took the money with his right. While this may not amount to a unique signature crime, the reality is that the district court could admit evidence of the Florence robbery so long as these two permissible objectives of the evidence—motive and identity, *taken together*—were more probative than any impermissible uses were prejudicial. *See* Fed. R. Evid. 403; *Poulsen*, 655 F.3d at 508. That was the case here.

Fortifying that conclusion is the court's limiting instruction, which told the jury that Washam was "not on trial for the Florence bank robbery" and that they could consider evidence of that robbery "only insofar as it may apply to the government's claim of motive and identity." JA 452. The district court repeated this limiting instruction two more times. Such limiting instructions go a long way to reducing any possible prejudice from Rule 404(b) evidence. *See United States v.*

*Lattner*, 385 F.3d 947, 958 (6th Cir. 2004). The district court did not abuse its discretion by admitting evidence about the Florence robbery.

But even if that were not the case, any error was harmless. *See* Fed. R. Crim. P. 52(a). The other evidence in the record of Washam's guilt was "overwhelming." *United States v. Hardy*, 643 F.3d 143, 153 (6th Cir. 2011). Three different eyewitnesses identified Washam as the Bowling Green robber, and Washam sold a car matching the description of the Bowling Green robber's getaway car (down to having 2-1-3 as the first three digits of the license plate) within weeks of the robbery. This evidence "eliminat[es] any fair assurance that the conviction was substantially swayed by" a potential Rule 404(b) error. *Id*.

Washam separately objects to the admission of the gun that he used during the Florence robbery, claiming he stole the gun from a neighbor *after* the Bowling Green robberies occurred so it could not have been the same gun used in those robberies. Def. Supp. Br. at 14–16. Washam has nothing to support this contention other than his say-so, and admits he never disclosed this (purported) fact to anyone before the trial—not to the government, not to the district court, not even to his own lawyer. *Id*. The district court could not have excluded the gun on grounds never raised.

*Prosecutorial Misconduct*. Washam argues that the district court erred by denying his motions for a mistrial based on two instances of prosecutorial misconduct. We review the denial of such motions for abuse of discretion, *United States v. Cope*, 312 F.3d 757, 779 (6th Cir. 2002), and we see none here. Washam first complains about the prosecutor's request that he show his teeth so

a teller from the Florence bank could identify him. Washam refused and his attorney moved for a mistrial. Even if we assume that the prosecutor's request was improper, there was nothing "flagrant" about it, as required to obtain a new trial on this ground. *United States v. Wells*, 623 F.3d 332, 337–38 (6th Cir. 2010). This was a single isolated request, the district court instructed the jury to disregard it, and it caused Washam little (if any) prejudice. At most Washam argues that his refusal to comply with the request "placed [him] in a negative light before the jury," Def. Br. at 19, but any such prejudice was minimal in comparison with "the overall strength of the evidence against" him. *Wells*, 623 F.3d at 338.

Washam next argues that the district court should have declared a mistrial when the prosecutor said during his opening statement: "You're not going to hear every single thing about this case or about Mr. Washam. Lot of that would not be permitted for us to put on. Lot of it we don't have." R. 178 at 150. There was nothing improper about this statement. In the preceding sentence the prosecutor asked the jury "not [to] base your verdict on speculation." *Id*. In context, the prosecutor was merely informing the jury that some evidence about the crime and Washam's past would not be admitted, and they should base their verdict only on the evidence in the record—an entirely proper admonition.

*Sentencing*. Washam faults the district court for not stating on the record during sentencing that it knew the guidelines were advisory and for not explaining why it ordered the sentences on Washam's two § 924(c) convictions (for using a firearm during a violent felony) to run consecutively to each other. A district court judge is not required to state on the record that the guidelines are

advisory, *United States v. Bailey*, 488 F.3d 363, 367 (6th Cir. 2007), and running the § 924(c) sentences consecutively was not the district court's decision to make; the statute itself requires that they be consecutive, 18 U.S.C. § 924(c)(1)(D)(ii).

*Jury Composition*. Washam separately challenges the racial composition of the grand jury that indicted him and the venire from which his petit jury was selected under the Jury Selection and Service Act, 28 U.S.C. § 1861, et seq. The Act creates a statutory right for criminal defendants in federal court to have "grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." *Id*. § 1861. Defendants must raise any claims under the Act "before the voir dire examination begins." *Id*. § 1867(a). Washam did not raise his jury-composition challenge until almost five months after his trial. His claims under the Act are therefore time-barred. *Id*.; *see United States v. Ovalle*, 136 F.3d 1092, 1098 (6th Cir. 1998).

Washam also appears to raise a Sixth Amendment challenge to the composition of the jury. Def. Supp. Br. at 9. But he did not raise any such challenge in the district court, which forfeits the point here. *See Ovalle*, 136 F.3d at 1107. Washam would need to demonstrate "cause" and "prejudice" to overcome this omission, *see id*., and he has not tried to do so.

*Speedy Trial*. Washam complains that his trial did not start in a timely manner, violating the Speedy Trial Act and the Sixth Amendment. But Washam forfeited his Speedy Trial Act objection because he did not file a motion to dismiss the indictment before trial. 18 U.S.C. §

3162(a)(2). His constitutional claim fares no better. Four factors guide our analysis of a constitutional speedy-trial claim: (1) the "[l]ength of delay," (2) "the reason for the delay," (3) "the defendant's assertion of his right" and (4) "prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). Although the three-year delay between Washam's arrest and trial is "presumptively prejudicial," *United States v. Young*, 657 F.3d 408, 414 (6th Cir. 2011), the other three factors defeat the claim: The key reason for delay was the litany of pre-trial motions that Washam filed, *see United States v. Bass*, 460 F.3d 830, 837 (6th Cir. 2006); Washam never asserted his speedy-trial right by filing any motions in the district court; and aside from speculating that certain unnamed alibi witnesses now have faded memories, Washam identifies no prejudice.

*Stipulation of prior felonies.* Last of all and least of all, Washam argues that the district court violated Rule 403 of the Federal Rules of Evidence and *Old Chief v. United States*, 519 U.S. 172, 191–92 (1997), by not allowing him to stipulate to his prior felony convictions. But the *Old Chief* rule would apply only to Washam's felon-in-possession charges, 18 U.S.C. § 922(g), and those charges were bifurcated before trial and dismissed after the jury verdict.

III.

For these reasons, we affirm.

No. 07-6179
*United States v. Washam*

**CLAY, Circuit Judge, dissenting.** Realizing that its case against Richard Washam was far from "overwhelming," (Maj. Op. 8), the government went on a zealous offensive to bolster its prosecution with inadmissible evidence. Having succeeded in securing erroneous evidentiary rulings from the district court, the government then was permitted to disregard the boundaries of narrow evidentiary exceptions. In a case built on three pieces of evidence—two of which were, at best, largely inadmissible—I cannot agree that the jury verdicts were based on a fair trial. Accordingly, I respectfully dissent.

## FACTUAL BACKGROUND

On March 26, 2003, an individual walked into a U.S. Bank in Bowling Green, Kentucky, approached a teller, pulled out a gun, and demanded money. Less than a month later, the same bank was robbed again under similar circumstances. In both robberies, the individual was described as an African-American man of slender build, thin facial features, and a calm demeanor, who was dressed in a dark-colored hooded windbreaker and partially disguised by a baseball cap and sunglasses. The crimes went unsolved.

Over one month later and three hours away, authorities apprehended Richard Washam minutes after he robbed a PNC Bank in Florence, Kentucky. Following his arrest, Washam confessed that he committed the Florence robbery to support a cocaine addiction. Believing that Washam's explanation indicated that this was not likely his first robbery, the FBI culled its records for similar unsolved bank robberies committed by an individual fitting Washam's description.

- 12 -

Coming across the two unsolved Bowling Green robberies, investigators prepared a photo array containing Washam's picture and showed it to several of the U.S. Bank employees. That array, however, was undisputedly suggestive. It did not include individuals who looked similar to Washam, and Washam's photograph was the only one that fit the description of the Bowling Green robber. Of the five employees shown the suggestive array, three, including two tellers, selected Washam's photograph as the one that most resembled the robber. After Washam was linked to a vehicle similar to the getaway car used at the second Bowling Green robbery, he was indicted on the present charges. At trial, only three pieces of evidence supported the prosecution's theory that Washam committed the Bowling Green robberies: the photo array identifications, the similarities to the Florence robbery, and the car. As explained below, neither the photo array identifications nor the evidence of the Florence robbery should have been admitted.

**ANALYSIS**

**I.     Photo Array Identifications**

**A.     Suppression Hearing**

Prior to trial, Washam moved to suppress the identifications made from the photo array. After an independent examination, the district court agreed that the array was unduly suggestive:

> In the present case, the descriptions given by the witnesses to the officers indicated that the bank robber was "thin," "skinny," "thin build," "not heavy," and "not overweight." Armed with this description, the officers presented the witnesses with a photographic array comprised of six African-American males . . . . However,

Washam's features bear little resemblance to the others in the array. Defendant's picture clearly contains facial features or characteristics foreign to all of the other pictures. Washam's face appears long and thin, whereas the other five individuals have rounder, fuller features. Additionally, Washam's nose and [cheek] bone structure do not in any way resemble the other five individuals . . . . Clearly, with the witness descriptions of the bank robber as a thin man, the placement of Defendant's photo in a photo array with clearly heavy set men with round full faces suggests to the witnesses that the Defendant "is more likely to be the culprit." The Court concludes that the dissimilarities among the participants in the photo array resulted in an identification procedure which was unduly suggestive to Washam.

(RE 75, Op. and Order 4–7) (internal citations omitted).

Having deemed the array suggestive, the court held a second evidentiary hearing allowing the government to prove that the identifications were nevertheless reliable.[1] To support that effort, the government elicited the testimony of the three employees who selected Washam's photograph from the array. For each witness, the government introduced written statements made by the employees when they were first presented with the array. One employee wrote, "I [] feel that number 3 looks very similar to the gentleman that robbed our branch. When I saw the lineup he immediately jumped out at me." (RE 99, Hr'g Tr. 9.) The second employee wrote, "[N]umber 3 looks like the robber." (*Id*. at 28.) The third employee wrote, "Possible number 3, same shaped face, cheekbone structure, eyebrows look like the [robber]." (*Id*. at 40.)

After each employee read his or her written statement out loud, on the next beat, the prosecutor posed the following question:

---

[1]At the defense's request, Washam did not attend the second evidentiary hearing, in order to prevent taint.

- 14 -

> Now, one might say that when someone says that a photograph looks like someone, that the person identifying the photograph might not be sure. Are you sure that number 3 was the robber?

(*Id*. at 9, 28–29, 40.)

In response to the prosecutor's leading question, the first employee changed his identification. As did the second employee. And so with the third employee. In each instance, the employee changed his or her identification to positively identify Washam *as* the robber, not merely someone who *looked like* the robber. Based on this testimony, the district court issued a short oral opinion admitting the photo array identifications as reliable. At trial, only one of the three employees was able to successfully identify Washam in person.

### B.     Legal Framework

"A conviction based on identification testimony violates the defendant's constitutional right to due process whenever the identification procedure is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *United States v. Meyer*, 359 F.3d 820, 825 (6th Cir. 2004) (quoting *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986)). This Court applies a two-step analysis for determining the admissibility of identification evidence. *Id*. (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1071–72 (6th Cir. 1994)). First, the defendant must prove that the identification procedure was unduly suggestive. *Ledbetter*, 35 F.3d at 1071–72. If the defendant proves suggestiveness, the burden then shifts to the government to prove that the totality of the circumstances demonstrates that the identification was "nevertheless reliable." *Id*. at 1071.

In reviewing a district court's ruling on a motion to suppress, we apply the clearly erroneous standard to the district court's factual findings and the *de novo* standard to its legal conclusions. *Meyer*, 359 F.3d at 824 (citing *United States v. Dotson*, 49 F.3d 227, 229 (6th Cir. 1995)). One such question of law is "[w]hether identification evidence was sufficiently reliable so as not to offend [the defendant's] rights under the due process clause." *Id.* (citing *Smith v. Perini*, 723 F.2d 478, 481 (6th Cir. 1983)). In this case, the district court found the array suggestive, and the government does not appeal that ruling. Accordingly, because the court's factual findings are not in dispute, the only question remaining is the reliability of the identifications, which we review *de novo*.

Reliability of the eyewitness identification is the "linchpin" of our suppression analysis. *See Perry v. New Hampshire*, 132 S. Ct. 716, 724–25 (2012) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). To determine whether an identification made off a suggestive procedure is nevertheless reliable, we apply a totality of the circumstances approach including those factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972) and reiterated in *Brathwaite*, 432 U.S. 98 (1977). *Perry*, 132 S. Ct. at 724–25:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention at the time of observation; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199.

### C. Analysis

Despite the full suppression hearing, the district court disposed of the *Biggers* factors in a perfunctory oral opinion. The court's opinion gave short shrift to the heightened due process concern that exists "when [] misidentification is possible because the witness is called upon to identify a stranger whom [the witness] has observed only briefly, under poor conditions, and at a time of extreme emotional stress and excitement." *Ledbetter*, 35 F.3d at 1070. The district court's ruling did not indicate that it considered any of the *Biggers* factors that favored Washam: for instance, that the robber was a stranger to the tellers, that the employees only interacted with the robber for a few brief minutes, or that several of the employees stated that the gun distracted their focus from the robber himself.

However, it is the evolution of the employees' initial identifications into their testimony at the evidentiary hearing that is my primary concern. The changes in their testimony pertain directly to the fourth *Biggers* factor: "the level of certainty demonstrated by the witness at the confrontation." *Biggers*, 409 U.S. at 199. The district court completely mishandled this factor when it allowed the employees' changed testimony to trump their initial identifications. As with all *Biggers* suppression, the court's focus should have remained on the level of certainty expressed by the employees when they made their initial identifications—in other words, the certainty expressed "at the time of confrontation." *Id*. A witness' level of certainty thereafter, especially after the identified individual has been arrested and indicted, is not part of the *Biggers*' analysis. Rather, continued certainty—or in this case, increased certainty—is tested through in-court identification and cross-examination.

The district court missed this distinction, and the majority repeats the error by dismissing the convenient change to the employees' testimony.

What should have been significant to the district court were the statements the employees made when they were first shown the array. At that stage, each employee made statements indicating that they selected Washam's picture because his was the one that most resembled or "looked like" the robber. However, as all parties agree, Washam was the *only* individual pictured that plausibly "looked like" the robber. Therefore, the employees' certainty on that score provides little to support the reliability of their selections from the photo array.

Tellingly, the employees' testimony at the evidentiary hearing only reinforces that they noticed Washam's photograph did not resemble the others. One employee stated that Washam's photograph "immediately jumped out" from the others. Another noted that Washam's photograph was the only one with a "shaped face, cheekbone structure, [and] eyebrows" that looked liked the robber—the exact same qualities that led the district court to find the array suggestive. The last employee testified that Washam's photograph was the only one "even close" to looking like the robber. These statements clearly indicate that the employees' selections were affected by the suggestiveness of the array and were therefore unreliable. As such, the photo array identifications should have been suppressed.

All too often, investigatory identifications are treated as one in the same with in-court identifications. However, they are different pieces of proof with different evidentiary value, and they

ought not be conflated. Excluding a suggestive investigatory identification is not fatal to the prosecution, although of course, doing so may weaken the government's case. It is, however, the appropriate course of action, especially given the greater evidentiary value of pretrial identifications. (*See* Maj. Op. 7.) Excluding an unreliable pretrial identification only forces the government to rely solely on a witness' in-court identification. Of course, in this case and with the benefit of hindsight, we know that only one of the three employees was able to repeat his positive identification at trial.[2]

Finally, I am troubled by the government's efforts to bolster the photo identifications at the evidentiary hearing. Its efforts suggest that the prosecutor, if no one else, recognized the deficiencies of the identifications and sought to repair them. However, the employees' willingness to change their testimony at the prosecutor's behest certainly does not improve their credibility or inspire further confidence about the reliability of the photo array identifications.

## II.    Florence Bank Robbery

Rule 404(b) of the Federal Rules of Evidence provides that a defendant's prior bad acts may not be used as proof of propensity, though they may be offered for certain other permissible purposes. Admission under Rule 404(b) is limited by Rule 403, which requires the balancing of evidence's probative value against its prejudicial impact. While I agree that Washam's statement about his cocaine addiction was admissible to show motive, I cannot concur that the Florence

---

[2]The majority fails to mention that the only employee to identify Washam at trial was not one of the tellers and was the employee with the worst vantage point to observe the robber.

robbery was probative of identity under Rule 404(b).  Additionally, the district court utterly failed to tailor the admission of the Florence robbery to any permissible purpose, in contravention of Rule 403.

"Prior acts or crimes [may] be admitted to show identity, provided they are of 'sufficient distinctive similarity' with the charges in the indictment to 'create a pattern or *modus operandi*.'" *United States v. Allen*, 619 F.3d 518, 524 (6th Cir. 2010) (citing *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006), *Mack*, 258 F.3d at 554).  This case falls far below that standard. Here, the commonalities, even if viewed cumulatively, were not sufficiently unique to constitute a signature or *modus operandi* that would be at all probative of identity.  At best, the similarities were vague—a nondescript perpetrator committing a robbery in an unorganized and unsophisticated fashion.  This level of generality cannot rise to the level of a common plan, a distinctive pattern, or a signature. *See United States v. Clay*, 667 F.3d 689, 695–96 (6th Cir. 2012);  *United States v. Phillips*, 599 F.2d 134, 136 (6th Cir. 1979).  Instead, the generalities of the prior crime only emphasized the impermissible inferences that (1) Washam was a "bad man" by virtue of his criminal history; and (2) that because he committed another robbery, be probably committed the ones charged.  *Phillips*, 599 F.2d at 136; *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994).  If the parallels claimed here were truly "distinctive," as the majority contends (Maj. Op. 7), then the exception swallows the rule, and the admission of propensity evidence becomes the standard of the day.

Comparing this case to others where we have applied a totality-of-similarities approach reveals just how threadbare the alleged similarities are in this case.  For instance, in *Mack* we found

that Rule 404(b) evidence was properly admitted where, over a series of over nine robberies, the perpetrator wore a ski mask with a hooded sweatshirt, leapt over the teller counter to retrieve the monies, and leapt back over it in leaving. *Mack*, 258 F.3d at 553–54. In *Perry*, we found a series of robberies sufficiently unique, where the perpetrator's signature involved seeking change for a $50 bill and asking to purchase money orders before pulling a gun out of a bookbag and demanding money. *Perry*, 438 F.3d at 648. Likewise, in *United States v. Price*, 516 F.3d 597, 603–04 (6th Cir. 2008), the robber forced an employee into the closed bank at gunpoint, turned off the alarm, accessed the vault, and forced the employee to lie on the ground until he escaped. By comparison, the alleged commonalities in this case are utterly unremarkable.

By contrast, the dissimilarities among the robberies Bowling Green and Florence robberies were far more distinctive than were any of their purported similarities. For instance, the means of the robber's escape was not consistent. In the Bowling Green robberies, the perpetrator wore a baseball cap and sunglasses, but the Florence robber did not take such efforts to conceal his identity. Perhaps the most unusual aspect of the Bowling Green robberies—the ruse of asking for change of smaller bills into larger ones and vice versa—was not used in the Florence robbery. *Cf Perry*, 438 F.3d at 648. Moreover, the robber's friendly demeanor was not consistent, as the majority claims. In at least one of the Bowling Green robberies, the teller testified that the robber was immediately aggressive with her. (RE 179, Tr. at 112.)

Finally, even if the Florence robbery was relevant for certain limited purposes under Rule 404(b), Rule 403 requires its exclusion "if its probative value is substantially outweighed by the

danger of unfair prejudice." Fed. R. Evid. 403. The district court failed to strike the proper balance here. As the majority admits, the probative value of the Florence robbery to Washam's guilt of the charged crimes was quite limited. However, despite acknowledging its prejudice, the court made no effort to limit the admission of the Florence robbery to its permissible evidentiary purposes.

Instead, the court allowed the prosecution to introduce the entire body of evidence one would expect if Washam had been on trial for the Florence robbery instead. The government presented three different officers who testified in detail about their investigation of the Florence robbery, Washam's attempt to evade authorities, his arrest shortly after fleeing the bank, and the incriminating evidence discovered on his person and in his car thereafter. *See United States v. Hemphill*, 76 F. App'x 6, 15 (6th Cir. 2003) (describing similar evidence as extrinsic and prejudicial to the jury's evaluation of the crimes charged). The jury also heard extensive testimony from the Florence bank teller, who described not only her limited interactions with the robber, but also details that were not probative of the Bowling Green robber's identity. The most blatant example occurred when the Florence teller was asked to identify Washam in court. Only after the defense objected and the teller was unable to immediately make an in-court identification, did the government abandon its efforts and concede that the Florence teller's identification was not probative of the Bowling Green robber's identity.[3]

---

[3]The government's attempt to secure this irrelevant identification also likely prejudiced Washam before the jury, because he refused to stand and smile at the teller's request, giving the jury the impression that he was evasive and uncooperative.

Moreover, the court admitted extensive testimony regarding the gun used in the Florence robbery. During opening statements, the prosecutor admitted that the gun was of limited probative value, because none of the Bowling Green employees could identify the gun as the one used against them.[4] (RE 178, Tr. 142–43.) Despite the weakness of this link, the court admitted the gun into evidence, allowed the prosecution to prominently display it throughout trial, and permitted the prosecutor's to encourage multiple witnesses to physically examine the weapon. The lead FBI agent of the Bowling Green crimes also used the gun as a prop and presented a detailed explanation of its capabilities and characteristics. This concerted emphasis went far beyond any limited permissible purpose.

The government argues that it was necessary to introduce the full background of the Florence robbery because Washam's motive and his link to the Bowling Green getaway car could not have been presented in another manner. These arguments are baseless. Washam's statement about his cocaine addiction could have been introduced without mentioning the Florence robbery at all. Likewise, Washam's sale of his white sedan the day after the Bowling Green robbery, while assuredly probative of his guilt, was a fact that existed independently to the details of the Florence robbery. The testimony of the car's purchasers and of the state vehicle registration officials could easily have been presented without introducing the entire Florence case to the jury.

---

[4]In fact, the Bowling Green employees never consistently testified that the gun was even similar to the one used against them. All the employees could say was that the gun they saw was a handgun; the employees inconsistently described the gun as silver, black, dark grey, metal, and plastic. (*See, e.g.* RE 154, 104; RE 179, 8–9.)

Moreover, even if the purported similarities among the robberies were probative of the robber's identity, their parallels could have been introduced by a variety of less prejudicial means, including: by defense stipulation, by reading from Washam's plea agreement in the Florence case, by calling only the lead investigator of the Florence robbery, or by calling only the Florence teller. *Clay*, 667 F.3d at 697 (citing *United States v. Haywood*, 280 F.3d 715, 723 (6th Cir. 2002); *United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996)) ("One factor in balancing unfair prejudice against probative value under Rule 403 is the availability of other means of proof.") At the very least, the testimony could have been curtailed substantially to limit its prejudicial effects. Instead, the transcript shows that the prosecution spent roughly forty percent of its case-in-chief presenting evidence to the jury about the Florence robbery. That amount of time, of course, only rises sharply if we consider the amount of time the defense spent combating the improperly admitted evidence.

The facts of this case bear close similarity to those that caused the Third Circuit to reverse the defendant's conviction in *United States v. Hans*, 738 F.2d 88 (3d Cir. 1984). In *Hans*, the trial court admitted the testimony of an investigating FBI agent, who described the manner in which the defendant became the suspect of the charged robbery. *Id*. at 94. The agent testified that, after learning that one of the other suspects was originally from Michigan, he contacted Detroit FBI agents and presented them with the *modus operandi* and a description of the robbers and "asked them if they had anyone from the area who might logically fit as a suspect in this matter." *Id*. Despite the far more distinctive similarities among the crimes in *Hans*—all involving three armed robbers

wearing Halloween masks, windbreakers, dark gloves, and ranging in height from 5'5" to 5'9"—the Third Circuit held that the agent's testimony was improperly admitted propensity evidence. *Id*. at 95. The court explained that "the only reasonable inference that a reasonable juror could draw from [the agent's] testimony was that [the defendant] was well-known as a bank robber to the Detroit FBI." *Id*. Similarly, the court reasoned that, even if admissible under 404(b), the testimony was "highly prejudicial" under Rule 403. The court found it "difficult to imagine testimony more prejudicial than [the FBI agent's] implication" that the defendant was known to Detroit police to be a professional bank robber. *Id*. I share the *Hans* court's concern that the other acts evidence here, along with the manner by which it was introduced, encouraged the jury to draw the very inferences forbidden by Rule 404(b). *Merriweather*, 78 F.3d at 1079.

Our review must take into account "what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened." *United States v. Cowart*, 90 F.3d 154, 158 (6th Cir. 1996) (citing *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)). "While a limiting instruction can minimize the prejudicial impact of prior criminal acts, it is not a 'sure-fire panacea for the prejudice resulting from needless admission of such evidence.'" *Clay*, 667 F.3d at 696 (quoting *Haywood*, 280 F.3d at 724)). In a case where well over half the evidence presented to the jury concerned a crime for which the defendant was not on trial, I cannot say with a "fair assurance that the jury's verdict was not substantially swayed" by the improperly admitted evidence, regardless of the court's brief limiting instructions. *Merriweather*, 78 F.3d at 1079 (internal quotations omitted).

**CONCLUSION**

Undoubtedly, the FBI's instinct that Washam may have committed other robberies prompted its investigation into him for the Bowling Green crimes. The photo array identifications provided evidence to believe that the investigators' instincts were valid and made Washam a viable suspect for the unsolved robberies. However, evidence that supports probable cause for an arrest is not always admissible at trial. *See generally Phillips v. Allen*, No. 10-3559, 2012 WL 414815, at *3 (7th Cir. 2012) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)). Often, our legal process must shield certain investigatory leads from the jury's view in order to ensure the defendant receives his constitutionally guaranteed due process. Although the ultimate harm caused by these errors is a perhaps the closer question in this case, the stakes here are high. Washam was 46-years-old at sentencing, and the district court's 677-month prison term, imposed largely by way of mandatory minimums related to his Florence conviction, represents a life-sentence. Accordingly, in a prosecution where the evidence was largely improperly admitted, I cannot simply rubberstamp the verdicts and must respectfully dissent.